**No. 25-2372**

---

**UNITED STATES CIRCUIT COURT**
**FOR THE FOURTH CIRCUIT**

---

City of Baltimore ex rel. Ebony Thompson
*Plaintiff-Appellee*,

v.

DraftKings Inc.; Flutter Entertainment PLC,
d/b/a FanDuel, Inc., an Irish Corporation
*Defendants-Appellants*

---

On Appeal from the United States District Court
for the District of Maryland, Case No. 1:25-cv-01487-SAG,
Hon. Stephanie A. Gallagher

---

# RESPONSE TO OPENING BRIEF

---


Ebony M. Thompson
Sara Gross
Thomas P.G. Webb
**BALTIMORE CITY LAW DEPARTMENT**
City Hall
Room 101
100 North Holliday Street
Baltimore, Maryland 21202
Tel: (443) 984-3421
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov
thomas.webb@baltimorecity.gov

Adam J. Levitt
Daniel R. Ferri
Daniel R. Schwartz
Eaghan Davis
**DICELLO LEVITT LLP**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
dschwartz@dicellolevitt.com
edavis@dicellolevitt.com

*Counsel for Plaintiff, the City of Baltimore*

## FED. R. APP. P. 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, the City of Baltimore states that Plaintiff is a municipal corporation organized under the laws of the State of Maryland. Baltimore is not a publicly traded corporation, with no entity owning more than 10% of its stock.

# TABLE OF CONTENTS


FED. R. APP. P. 26.1 DISCLOSURE STATEMENT i

TABLE OF CONTENTS ii

INTRODUCTION 1

JURISDICTIONAL STATEMENT 2

STATEMENT OF ISSUE PRESENTED FOR REVIEW 2

STATEMENT OF CASE 2

SUMMARY OF ARGUMENT 9

ARGUMENT 12

I. The Lawsuit Concerns An Area Of Core State Police Power And A Federal Forum Would Be Disruptive Of State Efforts To Establish A Coherent Policy ........................................................................................................ 13

A. Core State Police Power ........................................................................ 13

B. Maryland Has Created A Complex Policy Framework Implicated By This Suit ........................................................................................................ 15

C. Federal Judicial Intervention Threatens To Disrupt A Complex Statutory Framework ........................................................................................ 17

II. Appellants' Other Arguments Should Not Persuade the Court .................... 24

A. There Is No Requirement For Parallel Administrative Proceedings ......... 24

B. Consumer Protection Case Can Present Difficult Questions Of State Law 30

C. The Existence of a Federal Interest In Diversity Jurisdiction Does Not Preclude Abstention ........................................................................ 36

D. Question Certification Is Not a Substitute for Abstention ........................ 38

E. Federal Courts May Abstain When Matters Seek Injunctive Relief And Civil Penalties ........ 42

F. A State Court Should Be The First To Consider The CPO ........ 47

CONCLUSION 48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alig v. Quicken Loans Inc.*,
No. 5:12-CV-114, 2017 WL 5054287 (N.D. W. Va. July 11, 2017) 43

*Anne Arundel County v. Express Scripts, Inc.*,
No. CV MJM-24-90, 2025 WL 254807 (D. Md. Jan. 21, 2025) 42

*Bellotti v. Baird*,
428 U.S. 132 (1976) 39

*Boynton v. Ellis*,
57 F.2d 665 (10th Cir. 1932) 14

*Bryan v. BellSouth Commc'ns*,
377 F.3d 424 (4th Cir. 2004) 2

*Burford v. Sun Oil Co.,*
319 U.S. 315 (1943). *passim*

*Casey v. F.D.I.C.*,
583 F.3d 586 (8th Cir. 2009) 35

*Casino Ventures v. Stewart*,
183 F.3d 307 (4th Cir. 1999) 14

*Chambers v. King Buick GMC, LLC*,
43 F. Supp. 3d 575 (D. Md. 2014) 35

*CMDS Residential, LLC v. Mayor & City Council of Baltimore*,
714 F. Supp. 3d 583 (D. Md. 2024) 31

*Country Vintner of North Carolina, LLC v. E&J Gallo Winery, Inc.*,
461 F. App'x 302 (4th Cir. 2012) 34

*Crear v. JP Morgan Chase Bank N.A.*,
No. 10-10875, 2011 WL 1129574 (5th Cir. Mar. 28, 2011) 36

*DeLeon v. DraftKings, Inc.*,
No. 25-cv-644 37

*First Penn-Pac. Life Ins. Co. v. Evans*,
304 F.3d 345 (4th Cir. 2002) *passim*

*Gonzalez v. Sessions*,
894 F.3d 131 (4th Cir. 2018) 43

*Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*,
399 F.3d 1276 (11th Cir. 2005) 14

*Helton v. Hunt*,
330 F.3d 242 (4th Cir. 2003) 14

*Johnson v. Collins Ent. Co.*,
199 F.3d 710 (4th Cir. 1999) *passim*

*L. Cohen & Co. v. Dun & Bradstreet, Inc.*,
629 F. Supp. 1419 (D. Conn. 1986) 40

*Macek v. DraftKings, Inc.*,
No. 2:25-cv-3632 37

*Martin v. Stewart*,
499 F.3d 360 (2007) 21, 22, 37

*Martinez v. Amazon.com Servs. LLC*,
No. CV 22-00502, 2024 WL 4817214 (D. Md. Nov. 18, 2024) 42

*Marvin v. Trout*,
199 U.S. 212 (1905) 14

*Medina v. Rudman*,
545 F.2d 244 (1st Cir. 1976) 14

*Meredith v. Talbot Cnty., Md.*,
828 F.2d 228 (4th Cir. 1987) 12

*MLC Auto., LLC v. Town of S. Pines*,
532 F.3d 269 (4th Cir. 2008) 13, 42

*Murphy v. National Collegiate Athletic Association*,
584 U.S. 453 (2018) 3, 9, 20

*Nationwide Biweekly Admin., Inc. v. Superior Ct.*,
462 P.3d 461 (Cal. 2020) 45, 46

*Naylor v. Case & McGrath, Inc.*,
585 F.2d 557 (2d Cir. 1978) 47

*New Orleans Public Service, Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) 7, 25, 26, 28, 33

*Patel v. FanDuel, Inc.*,
No. 1:24-cv-7402 37

*Pittman v. Cole*,
267 F.3d 1269 (11th Cir. 2001) 42

*People v. Shifrin*,
342 P.3d 506 (Colo. Ct. App. 2014). 45

*Posadas de P.R. Assocs. v. Tourism Co. of P.R.*,
478 U.S. 328 (1986) 14, 15

*Quackenbush v. Allstate Insurance Co.*,
517 U.S. 706 (1996) *passim*

*SEC v. Jarkesy*,
603 U.S. 109 (2024) 46

*State v. State Credit Ass'n, Inc.*,
657 P.2d 327 (Wash. Ct. App. 1983) 45

*Time Warner Cable v. Doyle*,
66 F.3d 867 (7th Cir. 1995) 35, 36

*Tull v. United States*,
481 U.S. 412 (1987) 44, 46

*United States v. Edge Broad. Co.*,
509 U.S. 418 (1993) 14

*United States v. Washington*,
879 F.2d 1400 (6th Cir. 1989) 14

*State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*,
529 P.3d 599 (Colo. 2023) 45, 46

*Youngs v. DraftKings, Inc.*,
No. 2:25-cv-179 37

**Statutes**

28 U.S.C. § 1332(a)(1) 7

28 U.S.C. § 3702 3

Balt. City Code Art. 2, § 4 5

Balt. City Code Art. 2, § 4-1 5

Balt. City Code Art. 2, § 4-2 5

Balt. City Code Art. 2, §§ 4-3, 4-5(d) 5

Balt. City Code Art. 2, § 4-3(a) 44

Balt. City Code Art. 2, § 4-3(a), (b) 43

Balt. City Code Art. 2, § 4-3(b)-(c) 5

Md. Code Ann., State Gov't §§ 9-1E-01 3

Md. Code Ann., State Gov't §§ 9-1E-05 3

Md. Code Ann., State Gov't § 9-1E-17 30

Md. Code Ann., State Gov't §§ 9-1E. 15

**Other Rules and Authorities**

Fed. R. App. P. 26.1 i

Fed. R. App. P. 4(a)(1)(B) 2

Md. Const. Art. XIX, § 1(e) (2020) 3, 15

(April 4, 2025), https://www.wbaltv.com/article/baltimore-sues-sportsbooks-target-vulnerable-residents/64390523 16

Ballotpedia, *Maryland Question 2, Sports Betting Measure (2020)*, https://ballotpedia.org/Maryland_Question_2,_Sports_Betting_Measure_(2020 3

Legal Sports Report, *A Look Back at the Long and Winding Road to Maryland Online Sports Betting*, available at: https://www.legalsportsreport.com/90843/history-of-maryland-sports-betting-launch/ 3

Maryland General Assembly, *Article § 9-1E-01*, https://mgaleg.maryland.gov/mgawebsite/Laws/StatuteText?article=gsg&section=9-1E-01&enactments=false 3

Problem Gaming, *Statewide Gambling Prevalence in Maryland: 2011*, https://www.mdproblemgambling.com/wp-content/uploads/2023/02/2011-Prevalence-Study.pdf 15

Problem Gaming, *Statewide Gambling Prevalence in Maryland: 2017*, https://www.mdproblemgambling.com/wp-content/uploads/2023/01/2017-Gambling-Prevalence-Report-Final-.pdf; 15

*Sports Wagering Regulations*, https://www.mdgaming.com/maryland-sports-wagering/sports-wagering-regulations/ 4, 15

## INTRODUCTION

The City of Baltimore (the City) sued to enforce its Consumer Protection Ordinance (CPO) against sports betting operators who prey on citizens by: (1) purposefully designing their platforms to create disordered gamblers; (2) actively seeking out users with gambling disorders; and (3) deliberately exploiting those users through predatory VIP programs or other inducements designed to keep those disordered gamblers betting.

The case is not, as Defendants insist, a "standard consumer protection dispute." (App. Br. at 2). No court—state or federal—has considered the application of such a consumer protection ordinance to the purposeful targeting of Maryland gamblers. As this Court explained in *Johnson v. Collins Ent. Co.*, 199 F.3d 710 (4th Cir. 1999), a case analogous with this one, "[t]he regulation of gambling enterprises lies at the heart of the state's police power," and "[f]ormulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens." *Johnson,* 199 F.3d at 720. As it further explained, a first-in-time enforcement of a consumer protection ordinance regarding a defendant's gambling program will "have a potentially broad sweep, and the meaning accorded to [the terms unfair and deceptive] will chart the course of state public policy." *Id.* at 721. A "district court err[s] . . .in manning the rudder in this aspect of state gaming policy

when it decide[s] for itself that [the gaming implementation represented] unfair trade practices as a matter of law." *Id.*

The District Court, employing a straightforward interpretation of this Court's *Johnson* decision, did not abuse its discretion when it abstained from taking jurisdiction. As it explained, "Maryland needs to determine, through its courts or otherwise, how it will formulate coherent sports betting policy either despite, or working with, the City's unique interests and concerns. It is not the place of the federal courts to be dictating, manning, or influencing how those jurisdictions work through that process, given the limited or nonexistent federal interest." JA160 (Memorandum Opinion). The District Court should be affirmed.

## JURISDICTIONAL STATEMENT

Plaintiffs agree that this Court has appellate jurisdiction over the District Court's November 12, 2025, Remand Order. *See* JA150-169; Fed. R. App. P. 4(a)(1)(B); *Bryan v. BellSouth Commc'ns*, 377 F.3d 424, 428 (4th Cir. 2004).

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the District Court abused its discretion by invoking *Burford* abstention to decline jurisdiction over a case involving a first-of-its-kind interpretation of a complex gambling framework and containing no federal issues.

## STATEMENT OF CASE

For decades, Maryland, like most states, prohibited sports betting after the

1992 passage of the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3702. That changed in 2018, when the United States Supreme Court struck down PASPA in *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), and in 2020, when Maryland voters approved a constitutional amendment authorizing sports betting, Md. Const. Art. XIX, § 1(e) (2020).[1] The General Assembly subsequently passed HB0940 in May 2021 and enacted comprehensive sports betting legislation, creating an intricate regulatory framework overseen by the Maryland Lottery and Gaming Control Commission (MLGCC). Md. Code Ann., State Gov't §§ 9-1E-01, *et seq*.[2]

This wasn't a casual policy choice. Maryland spent years studying other states' experiences, balancing competing interests, and crafting regulations that would generate revenue while also protecting consumers.[3] The resulting legislative framework addresses a range of issues, including licensing requirements, advertising standards, and resources for problem gambling. *See, e.g.*, Md. Code Ann., State Gov't §§ 9-1E-05 (licensing), 9-1E-08 (license denial, fines, suspension), 9-1E-17

---

[1] Ballotpedia, *Maryland Question 2, Sports Betting Measure (2020)*, https://ballotpedia.org/Maryland_Question_2,_Sports_Betting_Measure_(2020).

[2] Maryland General Assembly, *Article § 9-1E-01*, https://mgaleg.maryland.gov/mgawebsite/Laws/StatuteText?article=gsg&section=9-1E-01&enactments=false.

[3] *See* Legal Sports Report, *A Look Back at the Long and Winding Road to Maryland Online Sports Betting*, available at: https://www.legalsportsreport.com/90843/history-of-maryland-sports-betting-launch/.

(advertising restrictions). From there, the MLGCC promulgated extensive regulations touching on all aspects of mobile sports betting, including provider applications, qualifications, license denials, enforcement actions, inspections, voluntary exclusion programs, mandatory exclusion programs, problem gambler programs and related funding, responsible gaming plans, taxes, fees, penalties, and internal controls. *See* COMAR Chapter 36, Subtitle 10.[4]

Following the legalization of online sports betting in Maryland, both DraftKings and FanDuel have unfairly identified, targeted, and then exploited disordered gamblers. As alleged in the Complaint, Defendants engage in deceptive marketing practices—such as the promotion of so-called "risk free" bets that are not actually without risk—to entice users. JA042-JA046. Once those users begin gambling, Defendants leverage giant data sets acquired by tracking their users to identify the users who are disordered gamblers—individuals for whom gambling has become an addiction over which they do not have sufficient control. JA046-JA049. Upon identifying those people, Defendants exploit them, both through "VIP programs" designed to increase player activity and automated promotions designed to overcome problem gamblers' resistance. JA049-JA061. The Complaint identifies

---

[4] Maryland Lottery and Gaming Commission, *Sports Wagering Regulations*, https://www.mdgaming.com/maryland-sports-wagering/sports-wagering-regulations/.

specific users of both DraftKings and FanDuel who were exploited in this manner. JA053-JA055, JA061-JA064.

On October 11, 2023, Mayor Scott signed Council Bill 23-0424 into law and enacted Baltimore's consumer protection ordinance to provide robust remedies against unfair and deceptive business practices. Balt. City Code Art. 2, § 4, *et seq*. The CPO's enforcement mechanisms reflect Baltimore's commitment to consumer protection, empowering the City to investigate violations and the City Solicitor to bring civil actions on behalf of the Mayor and City Council. The City may seek civil penalties of up to $1,000 per violation and obtain temporary and permanent injunctive relief to prevent ongoing harm. Balt. City Code Art. 2, §§ 4-3, 4-5(d). The ordinance broadly prohibits "unfair, abusive, or deceptive trade practices" in the sale or offer for sale of consumer goods, consumer services, or consumer realty within city limits. Balt. City Code Art. 2, § 4-2. Each violation constitutes a separate offense, and continuing violations can result in daily penalties, providing a strong deterrent against predatory business practices. Balt. City Code Art. 2, § 4-3(b)-(c).

The CPO also explicitly incorporates Maryland's Consumer Protection Act (CPA), stating that the "meaning" of "unfair, abusive, or deceptive trade practices" under the CPO shall have the same meaning as the term does in Title 13 of Maryland's Commercial Law Article. Balt. City Code Art. 2, § 4-1.

On April 3, 2025, the City filed a complaint against Appellants, alleging that Appellants violated the CPO when they: (1) used sophisticated algorithms to refine their targeting of vulnerable Baltimore users with personalized inducements designed to exploit users' gambling disorder; (2) used exploitative means to trick Baltimore consumers into betting, including through the misleading use of betting inducements; (3) misrepresented the nature, terms, and conditions of those promotional offers by failing adequately to disclose material terms and conditions; (4) used data collected to identify Baltimoreans with a gambling disorder and then specifically directing promotions and/or notifications at such users to induce them to bet further; (5) deployed push notifications, emails, and in-app messages with misleading urgency purposefully directed to those Baltimoreans that Defendants know, suspect, or have reason to know have a gambling disorder; (6) used VIP programs to identify and exploit those with gambling disorders; (7) offered escalating rewards through those VIP programs in order to further incentivize harmful behavior and target Baltimoreans with gambling disorders; and (8) failed to implement effective responsible gambling measures to identify Baltimoreans whom Defendants should not be targeting for promotions. JA071-JA072.

Prior to the filing of this case, no court—state or federal—has been asked to consider the potential interplay between the online sports gaming regulations and Maryland's Unfair Practices Act or Baltimore's CPO. Indeed, this matter was the

first *ever* filed under Baltimore's CPO regarding sports betting, and only the second ever filed under the CPO at all.

In May 2025, Appellants removed the matter to federal court, pursuant to 28 U.S.C. § 1332(a)(1). JA010. The City timely moved to remand,[5] urging the district court to decline federal jurisdiction. JA081. The District Court agreed. JA165. Citing *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (*NOPSI*), the Court asked whether (1) "there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result" of the case at bar, or (2) whether "the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of public concern." JA152.

The District Court found both factors to be present here. After noting that this action is not a typical civil complaint—but rather an enforcement action by the City seeking penalties and injunctive relief—and recognizing that the case is strikingly

---

[5] Defendants, throughout their briefing, invoke the fact that the City has, in other cases, similarly filed under the CPO against other defendants, and similarly moved to remand those matters back to state court. The City's having invoked *Burford* abstention in multiple matters is irrelevant to the Court's consideration of its propriety here. The abstention inquiry is case-specific, and the City is entitled to assert its rights in each case without being penalized for consistency. This Court should evaluate the merits of abstention in this case based on the facts and legal questions this case presents—not based on what the City has argued in unrelated litigation involving different industries and different regulatory regimes.

similar to *Johnson v. Collins Entertainment Co., Inc*, 199 F.3d 710 (1999), a state gambling law matter involving South Carolina's unfair trade practices act where the Fourth Circuit remanded on abstention principals, the District Court ruled:

> Defendants raise the fair point that the City itself risks disrupting Maryland's efforts to have a coherent online gambling policy in having enacted the CPO to impose its own, more stringent local restrictions. ECF 30 at 10 n.4, 11. But removing this lawsuit essentially asks this federal court to put its thumb on the scale regarding the City's efforts to alter Maryland's online gambling regulatory framework. By defining, in the first instance, the meaning of terms like "unfair" and "deceptive" in the context of the growing market of online gambling, this Court would be removing those decisions from the purview of the state courts before they have had any opportunity to weigh in on the CPO. And, if this Court ultimately were to conclude that conduct is permitted by the state regulations but violates the CPO, a dilemma would ensue – Maryland would either be left with a non-coherent policy where certain conduct is lawful in some parts of the state but not in Baltimore City, or Maryland would have to impose new statewide restrictions comporting with this Court's determination and the City's view of fair trade practices. Maryland's state courts are far better equipped to address, in the first instance, the complex state law issues and interests presented in this scenario.…
>
> This Court is being asked to answer disputed questions of state law, namely delineating the proper interpretation of "unfair" and "deceptive" conduct in the context of marketing for sports betting, an issue that "powerfully impacts" the welfare of Maryland's citizens. And granting the relief sought would "effectively establish parallel federal and state oversight" of sports gambling in Maryland because the federal standard would govern in Baltimore City and the state standard would apply in the remainder of Maryland's jurisdictions. This case presents an uncharted issue of state law interpreting a new local statute in the context of a civil enforcement action brought by that local jurisdiction, substantial public policy concerns about the boundaries of marketing a multi-million-dollar industry, and the gambling-specific "police power" factors that contributed to abstention in *Johnson*. Maryland needs to determine, through its courts or otherwise, how it will

> formulate coherent sports betting policy either in spite of, or working with, the City's unique interests and concerns. It is not the place of the federal courts to be dictating, manning, or influencing how those jurisdictions work through that process, given the limited or nonexistent federal interest. Accordingly, this is one of the extraordinary and narrow circumstances in which *Burford* abstention is warranted.

JA158-160. Appellants timely appealed the District Court's ruling. JA161.

## SUMMARY OF ARGUMENT

The District Court properly exercised *Burford* abstention to decline federal jurisdiction over this first-of-its-kind enforcement action involving Baltimore's CPO and Maryland's newly implemented sports betting regulatory framework. This case presents the paradigmatic scenario for federal deference: novel questions of state law at the intersection of consumer protection and gambling regulation—an area at the heart of state police power—where no court has addressed the issues presented and federal adjudication would disrupt Maryland's efforts to establish coherent policy.

Gambling regulation lies at the core of state police power. After the Supreme Court struck down the federal sports betting prohibition in *Murphy*, 584 U.S. at 453, Maryland deliberately exercised its sovereign authority through a constitutional amendment, comprehensive legislation, and extensive implementing regulations. This framework reflects Maryland's policy choices for balancing revenue generation, consumer protection, and responsible gaming in a rapidly evolving multi-billion-dollar industry that presents novel technological and regulatory challenges.

The City alleges that Defendants violate Baltimore's CPO by using sophisticated data analytics to identify and exploit users with gambling disorders through deceptive marketing, misleading promotions, and inadequate responsible gaming measures. JA041-JA059. This type of enforcement action—the first ever under the CPO—requires interpreting what constitutes "unfair" and "deceptive" conduct in online sports gambling, determining whether conduct that potentially complies with state gambling regulations nevertheless violates local consumer protection law, and deciding whether that violation warrants civil penalties and injunctive relief that would fundamentally alter how these platforms operate.

The principles underlying abstention here are the same as in *Johnson*, in which this Court applied *Burford* abstention to a challenge under South Carolina's unfair trade practices act alleging that video poker operators fostered disordered gambling. As in *Johnson*, this lawsuit: (1) invokes an unfair trade practices ordinance to challenge gambling industry practices; (2) seeks injunctive relief altering industry operations; (3) presents first-impression issues at the intersection of consumer protection law and gambling regulation; and (4) would require federal courts to "chart the course of state public policy" by defining "unfair" and "deceptive" conduct in a gambling context. *Johnson*, 199 F.3d at 720-21.

Indeed, this case presents an even stronger justification for abstention than *Johnson* does. Whereas *Johnson* dealt with traditional video poker under a stable

regulatory framework with a federal RICO claim, this purely state-law enforcement action concerns the emerging online sports betting industry, with rapidly evolving technologies, sophisticated data analytics, and mobile platforms governed by Maryland's newly implemented and still-developing regulatory scheme. Federal adjudication would create parallel federal and state oversight of Maryland's gambling industry, with federal standards governing Baltimore and state standards applying elsewhere.

Appellants' arguments fail to refute the district court's sound exercise of discretion. *Burford* abstention does not require parallel administrative proceedings—it requires only that federal adjudication would resolve difficult questions of state law on matters of substantial public import or disrupt state efforts to establish coherent policy. Both requirements are satisfied here. The fact that this case arises under a CPO does not preclude abstention; as *Johnson* demonstrates, consumer protection claims can present precisely the type of difficult, policy-laden questions warranting abstention when they intersect with core state concerns, such as gambling regulation. And the City's request for civil penalties and injunctive relief—not damages—falls squarely within the type of equitable and discretionary relief for which abstention is appropriate under *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996).

Maryland's state courts are better equipped to navigate the first-impression interplay between Baltimore's CPO and the state's complex gambling regulatory framework. The District Court properly exercised its discretion under the deferential abuse-of-discretion standard, and its decision should be affirmed.

## ARGUMENT

The *Burford* doctrine rests on a simple premise: federal courts must not interfere with state efforts to address local problems through comprehensive regulatory schemes, for "it is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford*, 319 U.S. at 318. The Fourth Circuit has made clear that district courts should abstain in matters that "(1) present difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) whose adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Johnson,* 199 F.3d at 719, *citing NOPSI,* 491 U.S. at 361.

At bottom, "[t]he underlying purpose of *Burford* abstention is to enable federal courts to avoid needless conflict with the administration by a state of its own affairs" *Meredith v. Talbot Cnty., Md.,* 828 F.2d 228, 231 (4th Cir. 1987) (citing 17 Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction § 4243)

(abstaining from federal adjudication), and serves the "central idea . . . of simple comity." *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008). The Fourth Circuit "may not disturb a district court's decision to abstain under *Burford* unless [it finds] an abuse of discretion." *First Penn-Pac. Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002). "That standard is a deferential one [and a] district court ruling may be a permissible exercise of discretion, even if an appellate court suspects that it might have ruled otherwise in the first instance." *Id.*

This matter fits squarely within the *Burford* abstention framework: it concerns the application of the CPO to online sports gambling, a substantially regulated industry operating in an area of core state concern. The suit therefore implicates: (1) areas of "state law bearing on policy problems of substantial public import"; and (2) the risk that adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of public concern. *First Penn-Pac. Life Ins. Co*, 304 F.3d at 348.

## I. The Lawsuit Concerns An Area Of Core State Police Power And A Federal Forum Would Be Disruptive Of State Efforts To Establish A Coherent Policy

This lawsuit presents the first opportunity for any court to consider the interplay between Maryland's sports gambling policy and consumer protection law.

### A. Core State Police Power

That the suit is at the core of the state's police power is undisputed. The Fourth

Circuit has explicitly recognized that gambling regulation lies at "the heart of the state's police power." *Johnson*, 199 F.3d at 715; *see also Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003); *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999). In this respect, the Fourth Circuit is no outlier: the Supreme Court has treated gambling regulation as a quintessential state function for over a century. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993); *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986) (*Posadas*); *Marvin v. Trout*, 199 U.S. 212, 224 (1905). Other circuits share this consensus. *See Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) ("The regulation of gambling lies at 'the heart of the state's police power.'"); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare."); *Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976) (recognizing state police power to regulate gambling); *Boynton v. Ellis*, 57 F.2d 665, 666 (10th Cir. 1932) (wisdom of gambling statutes within police power of state). Congress has "sought to extend, not curb, state police power in this field." *Casino Ventures*, 183 F.3d at 311.

States exercise their broad discretion in addressing gambling's effects in various ways. States may conclude that gambling brings an "increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of

organized crime." *Posadas*, 478 U.S. at 341. States may also conclude that gambling fosters addiction and exploits human weakness, taking money from those who can least afford to gamble. *Id.* States may also choose regulatory approaches over prohibition, concluding that gambling enhances public welfare through recreational choice and economic development. *Johnson*, 199 F.3d at 720. Whether—and how—to allow gambling is thus a local, state-level concern, and, as the district court ruled, one of "limited or nonexistent federal interest." JA160.

### B. Maryland Has Created A Complex Policy Framework Implicated By This Suit

Equally undisputed is that Maryland didn't stumble into sports betting. The State spent years studying the issue,[6] ultimately requiring a constitutional amendment, Md. Const. art. XIX, § 1(e) (2020), comprehensive legislation, Md. Code Ann., State Gov't §§ 9-1E, *et seq.*, and detailed implementing regulations before allowing sports betting to commence in the state.[7] The resulting statutory and regulatory framework represents the State's comprehensive approach to this newly legalized industry, developed through democratic processes, including statewide

---

[6] University of Maryland – Maryland Center of Excellence on Problem Gaming, *Statewide Gambling Prevalence in Maryland: 2017*, https://www.mdproblemgambling.com/wp-content/uploads/2023/01/2017-Gambling-Prevalence-Report-Final-.pdf; University of Maryland – Maryland Center of Excellence on Problem Gaming, *Statewide Gambling Prevalence in Maryland: 2011*, https://www.mdproblemgambling.com/wp-content/uploads/2023/02/2011-Prevalence-Study.pdf.

[7] Maryland Lottery and Gaming Commission, *Sports Wagering Regulations*, https://www.mdgaming.com/maryland-sports-wagering/sports-wagering-regulations/.

referenda, legislative deliberation, and rulemaking. Maryland's regulations reflect the State's sovereign policy choices about how best to implement sports betting within its borders.

The City alleges that Defendants are violating the law, *even if* Defendants technically comply with certain regulatory requirements (which Plaintiffs by no means concede). Defendants, in turn, are likely to rely on that technical compliance—for example, in response to this lawsuit, Defendant FanDuel has already stated in the press that it has "confidence [that] the company operates in accordance with laws . . . established and enforced by the state of Maryland Lottery and Gaming Control Commission."[8]

The District Court would, therefore, be tasked with analyzing the complex interplay between state regulatory permissions and local consumer protection standards—an intersection that Maryland courts, not federal tribunals, should interpret in the first instance. *Johnson,* 199 F.3d at 720–21. For example, Maryland's gambling regulations set parameters for how operators may collect and use customer information within the state's regulatory framework. *See, e.g.*, COMAR 36.10.16.03 (geolocation requirements); COMAR 36.10.16.05 (age verification); COMAR 36.10.18.05 (bettor account information); COMAR 36.10.18.06 (information

---

[8] 'WBALTV, 'Protect all Baltimoreans': City sues 2 sportsbooks alleging they target vulnerable residents (April 4, 2025), https://www.wbaltv.com/article/baltimore-sues-sportsbooks-target-vulnerable-residents/64390523.

security); COMAR 36.10.10.02 (responsible gaming plan); COMAR 36.10.10.03 (responsible gaming requirements). The City alleges that Defendants' use of this data to identify and target vulnerable populations violates Baltimore's CPO and that Defendants have been woefully deficient in their "responsible gaming" obligations under the regulations, a deficiency that likewise constitutes an unfair trade practice. Defendants are likely to argue that adherence to, e.g., data collection regulations—even if the data are ultimately used to target disordered gamblers—somehow insulates them from CPO liability.

### C. Federal Judicial Intervention Threatens To Disrupt A Complex Statutory Framework

The core claim in the proposed lawsuit—that Appellants engage in "unfair" and "deceptive" conduct in their online gaming practices—goes to the heart of the gambling regulation at issue. As this court explained in *Johnson* regarding the impact of South Carolina's unfair trade practices law on gambling policy:

> State unfair competition law is a tool that states use in an attempt to regulate vast spheres of activity with which the state police power has historically been concerned. The SCUTPA, like many similar state statutes, prohibits commercial conduct defined as "unfair" or "deceptive." *Id.* These terms have a potentially broad sweep, and the meaning accorded to them will chart the course of state public policy. The district court erred then in manning the rudder of this aspect of state gaming policy when it decided for itself that violations of the payout limit were unfair trade practices as a matter of law.

*Johnson,* 199 F.3d at 720–21. That is exactly what would occur here: the District Court would be asked to determine, for the first time, the scope of "unfair" and

"deceptive" conduct as it relates to sports gambling in Maryland, consider whether that conduct directly interferes with Maryland's regulatory scheme, and decide whether that (potential) interference mandates injunctive relief and penalties. As the District Court observed, citing *Johnson*, this lawsuit would ask it, "to answer disputed questions of state law, namely delineating the proper interpretation of 'unfair' and 'deceptive' conduct in the context of marketing for sports betting, an issue that 'powerfully impacts' the welfare of Maryland's citizens." JA159.

Indeed, *Johnson*, with respect to abstention, is on "all fours" with this matter and should control the outcome here. In *Johnson*, "Plaintiffs [were] habitual gamblers who have sued South Carolina poker operators as part of an effort to kick their habits," *Johnson*, 199 F.3d at 715, and sought to enjoin Defendants from making what Plaintiffs deemed to be excessive payouts to any given customer playing video poker—payouts governed by separate state regulation that Plaintiffs alleged fostered disordered gambling. *Id*. Here, the City likewise alleges that Defendants are engaging in behaviors that, while governed by certain state regulations, foster disordered gambling, including through problematic payment promotions. JA071-JA073.

In *Johnson*, the district court ultimately issued an injunction imposing requirements on the defendants, including requiring them to place a "clarifying sign" on video poker machines to better inform consumers of video poker payouts and to

interrupt the fostering of disordered gaming. *Id*. at 718. Here, the City likewise seeks injunctive relief that would force Appellants to "cease the targeting and exploitation of disordered gamblers" and "reform their platforms' exploitative platform design." JA074.

In *Johnson*, the matter—an interpretation of the propriety of the South Carolina cash payout from gaming machines—was one of first impression, meaning "the state court system should have been permitted the first opportunity to resolve it." *Id*. Just so here, as no court has yet interpreted any interplay between unfair competition law and the Maryland gambling framework.

Finally, like the plaintiffs in *Johnson*, the City invokes an unfair trade practices act—the CPO—alleging that Defendants' predatory implementation of its gambling platform is "unfair" and "deceptive." The interpretation of the CPO's application of the terms "unfair" and "deceptive" to online gaming would, as in *Johnson*, undoubtedly "chart the course of state public policy." *Johnson*, 199 F.3d at 721.

The importance of abstention here is even clearer than it was in *Johnson*. First, *Johnson* involved not only state statutes, but a federal one as well—the Racketeering Influenced Corrupt Organizations (RICO) Act—and *Johnson* was decided at a time when states primarily regulated traditional casino gambling under relatively static frameworks. By contrast, Maryland's current sports betting regime represents a

quantum leap in regulatory complexity. When the Supreme Court struck down PASPA in *Murphy*, 584 U.S. at 453, it unleashed a regulatory revolution. Sports betting operates in a dynamic digital ecosystem across multiple mobile platforms, awash in real-time data analytics and employing sophisticated customer-targeting algorithms, JA029, JA047, JA071, JA095—precisely the conduct at issue here.

The market now generates billions in annual revenue, attracting major technology companies and requiring constant regulatory adaptation as operators deploy new technologies and business models. JA027, JA031, JA061. The pace of technological change in sports betting far exceeds that of traditional gambling regulation. JA046-JA061. Operators continuously update platforms and deploy increasingly sophisticated data analytics to maximize user engagement. JA046-JA061. Unlike the relatively stable casino industry of previous decades, sports betting regulation requires nimble, adaptive oversight. JA027, JA032. Indeed, Maryland's regulatory framework continues to evolve alongside these developments, requiring ongoing policy decisions about the appropriate contours of acceptable gaming. JA062-JA064.

Appellants' attempts to distinguish *Johnson* likewise fail. They insist that *Johnson* was "primarily" concerned with interpreting an ambiguous daily payout law, with a merely "ancillary consumer-protection claim." (App. Br. at 50). Conspicuously, while Appellants characterize *Johnson*, they decline to quote from

it. In *Johnson*, the Court in fact made clear that the consumer-protection claim was nothing less than the "tool that states use in an attempt to regulate vast spheres of activity with which the state police power has historically been concerned," the interpretation of which would "chart the course of state public policy" regarding gambling. *Johnson*, 199 F.3d at 720.

Appellants attempt to *distinguish* Johnson as an outlier resulting from the "extraordinary remedial order" from the District Court in that case. (App. Br. at 51). Of course, Appellants ignore that the City seeks to enact a substantial change to the very functioning of Appellants' gaming applications, namely, to prohibit the targeting of problem gamblers that currently occurs, irrespective of whether such a prohibition is specifically provided in the Maryland regulatory structure. This is a larger change than the measures at issue in *Johnson*, which Appellants recognize were "notice and recordkeeping mandates." (App. Br. at 51). That this matter is at its inception, while *Johnson* had been through effectively a full federal hearing, is of no moment and, if anything, supports abstention now, as opposed to following years of litigation that ultimately reveals that the injunctive relief the City is awarded is "extensive." (App. Br. at 51).

Appellants urge that this Court's decision in *Martin v. Stewart*, 499 F.3d 360, 369 (2007), somehow counsels against applying *Johnson*—the single most analogous case in this or any other circuit—to this matter. But *Martin* does no such

thing. In *Martin*, this Court recognized that *Johnso*n remains rightly decided and clarified that where, as in *Johnson*, "federal adjudication . . .would require a federal court to answer disputed questions of state gaming law" and "effectively establish parallel federal and state oversight of the state [gaming industry]," abstention was perfectly proper. *Martin*, 499 F.3d 360 at 369. Of course, just such "parallel federal and state oversight" of the industry would be present if the federal court retains jurisdiction over this case, as this first-of-its-kind matter will, through application of the CPO's provisions, "chart the course of state public policy." *Johnson,* 199 F.3d at 720. In contrast to *Johnson*, the plaintiff in *Martin* offered no claims under state law, and no first-impression issues impacting state policymaking. Rather, the plaintiff alleged a violation of his rights under the Fourteenth Amendment based on application of a statute that the state's highest court had already defined. *Martin*, 499 F.3d at 366. The federal court was perfectly situated to adjudicate that sole federal claim, since it represented a facial attack on a well-defined state statute based on federal rights. *Id*. Unlike *Johnson* (or *this* case), the *Martin* matter was fundamentally federal in nature and did "not rest on finding a violation of state law," *Martin*, 499 F.3d at 368.

Finally, Appellants contend that any risk of dis-uniformity between Baltimore and the rest of Maryland stems from the City's own decision to enact the CPO, not from the choice of forum. (App. Br. at 39). But recognizing that the City created the

potential for regulatory tension between local and state standards does not answer the *Burford* question—it sharpens it. The relevant inquiry is not who created the potential for dis-uniformity, but which forum is better positioned to resolve it in a manner that serves the coherent development of state policy. On that question, the answer is unambiguous: state courts, not federal courts.

The distinction matters because of a structural asymmetry that Appellants ignore. (App. Br. at 39-40). Defendants incorrectly contend that federal courts are "perhaps better positioned" (App. Br. at 39) to address complex and novel disputes concerning state laws. When a Maryland state court interprets the CPO's application to online sports gambling, that interpretation exists within a self-correcting ecosystem of state governance. Time and again, federal courts applying *Burford* have made clear that state courts, and not the federal judiciary, are best positioned to address novel disputes that bear on significant state policy problems. *NOPSI*, 491 U.S. at 361. It is for Maryland trial and appellate courts to review the relevant state laws and regulations, harmonize their interpretation, and direct a broader state policy. Federal court intrusion on this project is exactly what *Burford* and its progeny seek to prevent.

In remanding this case, the District Court properly recognized that: (1) the case concerns an area of core state policy; (2) that policy involves a complex statutory and regulatory framework directly implicated by the lawsuit; (3) no state

court has yet decided the relevant issues; and (4) lest there be any doubt, *Johnson* has already made clear that state courts should be afforded the first opportunity to determine the scope of "unfair" and "deceptive" conduct in this area, as such interpretation "will chart the course of state public policy." *Johnson,* 199 F.3d at 720.

## II. Appellants' Other Arguments Should Not Persuade the Court

### A. There Is No Requirement For Parallel Administrative Proceedings

Core to Appellants' argument is their oft-repeated statement that there are no parallel administrative proceedings, *see* App. Br. at 12, 23, 26-28, and that, as a result, abstention is inappropriate. But this argument misreads both the Supreme Court's decisions and this Court's precedents. While the presence of parallel proceedings can support abstention, their absence does not preclude it—particularly where, as here, federal adjudication would set the initial course of state public policy on matters of core state concern.

The Supreme Court has never held that parallel proceedings are a prerequisite to *Burford* abstention. Indeed, the foundational cases establishing the doctrine varied considerably in their procedural postures. *Burford* challenged the validity of a prior Texas Railroad Commission order in federal court, *Burford*, 319 U.S. at 316. *NOPSI* occurred after the utility challenged a Louisiana electricity rate-making authority's determination in state court that apparently conflicted with federal administrative

law, in addition to parallel federal proceedings. *NOPSI*, 491 U.S. at 350. *Quackenbush* was premised upon an action in state Court involving the California Insurance Commissioner, *Quackenbush*, 517 U.S. at 706. As the Supreme Court explained in *NOPSI*, *Burford* abstention applies when federal adjudication would either: (1) require deciding "difficult questions of state law bearing on policy problems of substantial public import" or (2) "be disruptive of state efforts to establish a coherent policy." *NOPSI*, 491 U.S. at 361. Neither prong requires parallel proceedings; rather, both focus on the *substantive effect* that federal adjudication would have on state policy formation.

Beyond citing a slew of out-of-circuit authority for the proposition that parallel administrative proceedings can counsel for abstention, Appellants misread the only Fourth Circuit case cited, *First Penn-Pacific*, 304 F.3d at 346, in attempting to create a bright-line requirement for parallel administrative proceedings. (App. Br. at 26-28). They claim in their briefing that parallel proceedings are *so integral* to *Burford* abstention that, in *First Penn-Pacific*, this Court has "[a]ssum[ed] arguendo that *Burford* abstention is limited to cases involving the proceedings and orders of state administrative agencies." (App. Br. at 26), purporting to cite from *First Penn-Pacific*. But that quotation from *First Penn-Pacific* is taken out of context, and, indeed, this Court recognized in that very case that parallel proceedings are not required.

*First Penn-Pacific* involved a life insurance rescission action where a state-appointed receiver for a viatical settlement company intervened and moved to dismiss based on *Burford* abstention. 304 F.3d at 346. The Fourth Circuit affirmed the District Court's abstention because the case implicated ongoing state court receivership proceedings brought by the Maryland Securities Commissioner—a state administrative agency—that had *already* issued orders directing the receiver to manage and distribute the company's assets. *Id*. at 347, 350-51. The Court emphasized that continuing the federal action "would be inappropriate because it would infringe upon orders previously entered by the Circuit Court" and that "a conflict between the Circuit Court and district court proceedings has already arisen." *Id*. at 350.

Critically, however, *First Penn-Pacific* did not hold that such parallel proceedings are always required for abstention. The Court was merely addressing a situation where they existed. The Court's core analysis focused on whether federal adjudication would disrupt state efforts to establish coherent policy—the touchstone of *Burford*—not on whether parallel proceedings existed as a categorical prerequisite. Indeed, the Court explicitly stated: "The Supreme Court in *NOPSI* did discuss *Burford* abstention in the context of state administrative proceedings, but the Court has since addressed *Burford* abstention in the absence of a state administrative proceeding. *See Quackenbush*, 517 U.S. at 723–31." *First Penn-Pac.*, 304 F.3d at

351 n.3. Thus, the Court acknowledged that *Burford* can apply even without parallel administrative proceedings, so long as the case presents difficult state law questions or would disrupt state policy formation. *Id*.

The Fourth Circuit's statement in *First Penn-Pacific* that ongoing state receivership proceedings supported abstention merely reflects the unremarkable observation that *Burford* abstention is often invoked when federal courts risk acting as appellate tribunals reviewing state administrative decisions—not that such proceedings are the exclusive basis for abstention. Indeed, Judge Luttig's dissent in that case criticized the majority for expanding *Burford* beyond cases with parallel state administrative proceedings, confirming that the majority's holding was based on the broader principles of avoiding disruption to state policy, not on a rigid procedural requirement. *See id*. at 352-53 (Luttig, J., dissenting).

The important inquiry—and the one that the District Court correctly applied—focuses not on whether state proceedings happen to exist at the moment of removal, but on whether federal adjudication would foreclose the state judiciary from developing its own jurisprudence on questions of substantial state concern. That is the gravamen of *NOPSI's* two-pronged test: (1) whether federal adjudication would resolve "difficult questions of state law bearing on policy problems of substantial public import"; or (2) would "be disruptive of state efforts to establish a coherent policy." 491 U.S. at 361. Both prongs look *forward*—to the effect that federal

adjudication would have on state policy formation—not backward to whether state proceedings are already pending.

Here, the forward-looking concern is acute. No Maryland court—state or federal—has interpreted the interplay between Baltimore's CPO and Maryland's sports betting regulatory framework. No Maryland court has determined what constitutes "unfair" or "deceptive" conduct in the context of online sports gambling. No Maryland court has addressed whether compliance with MLGCC regulations insulates operators from consumer protection liability for targeting disordered gamblers. These are first-impression questions that Maryland's judiciary should have the initial opportunity to resolve.

What matters is not the procedural posture but the *substantive risk* that federal adjudication poses to state policy formation. As the District Court explained:

> By defining, in the first instance, the meaning of terms like "unfair" and "deceptive" in the context of the growing market of online gambling, this Court would be removing those decisions from the purview of the state courts before they have had any opportunity to weigh in on the CPO.

JA158. The District Court correctly recognized this, noting that, while "this case does not challenge any administrative enforcement action," *Burford* nevertheless compelled abstention. JA157.

Appellants contend that the complexity of Maryland's regulatory scheme is irrelevant because the City's claims are "entirely collateral" to that scheme, citing

the City's own statement that Defendants are "violating the law, irrespective of whether Defendants technically adhere to certain regulatory requirements." (App. Br. at 28). But this argument confuses the City's legal theory with the analytical task the court must perform. The City's position that CPO liability can attach despite regulatory compliance does not mean the court will assess that liability without engaging the regulatory framework—it likely means precisely the opposite. To determine whether conduct that satisfies state gambling regulations nonetheless constitutes an "unfair" or "deceptive" trade practice, the District Court must first understand what those regulations require, what they permit, what they affirmatively authorize, and where they are silent. The regulatory scheme is not collateral to the inquiry; it is the baseline against which the CPO's independent prohibitions are likely to be measured.

Consider the specific allegations at issue. The City alleges that Defendants use data analytics to identify and target disordered gamblers. JA046-JA049. But Maryland's regulatory framework specifically governs how operators collect, store, and use customer data. *See* COMAR 36.10.18.05 (bettor account information); COMAR 36.10.18.06 (information security); COMAR 36.10.16.03 (geolocation requirements). The City alleges that Defendants' promotional offers are deceptive. JA042-JA046. Maryland's framework specifically regulates advertising and promotional activity. *See* Md. Code Ann., State Gov't § 9-1E-17; COMAR

36.10.10.02-.03. The City alleges that Defendants' VIP programs exploit vulnerable users. JA049-JA061. Maryland's responsible gaming requirements impose specific obligations on operators regarding problem gambling identification and intervention. *See* COMAR 36.10.10.02 (responsible gaming plan); COMAR 36.10.10.03 (responsible gaming requirements).

At every turn, the District Court will determine where the regulatory framework's permissions end and the CPO's prohibitions begin, whether they intersect, and whether that intersection matters. That is not a task that can be performed in isolation from the regulatory scheme—it requires deep engagement with it.

### B. Consumer Protection Case Can Present Difficult Questions Of State Law

Appellants argue repeatedly that this case presents nothing more than a "standard consumer protection dispute" requiring only "application of familiar and longstanding consumer-protection standards." (App. Br. at 2, 18, 28-36). This characterization confuses both the nature of the City's claims and controlling precedents. The question is not whether the CPO is a consumer protection ordinance—it plainly is—but whether federal adjudication of this *particular* consumer protection ordinance to the issue at hand would require resolving difficult questions of state law that transcend this case and would disrupt Maryland's efforts to establish coherent policy on matters of substantial public concern.

### *1. This CPO Case Presents Difficult Questions of State Law That Transcend The Immediate Dispute*

Appellants contend that federal courts routinely adjudicate consumer protection claims and therefore this case cannot present "difficult questions" warranting abstention. (App. Br. at 28-33). But the mere fact that consumer protection claims are frequently litigated in federal court, (App. Br. at 30), does not mean that *every* consumer protection claim is appropriate for federal adjudication. This is no typical consumer protection case: it is an adjudication that goes to the foundation of Maryland's gambling regime, and involves hotly contested questions of local law. *Cf. CMDS Residential, LLC v. Mayor & City Council of Baltimore*, 714 F. Supp. 3d 583, 629 (D. Md. 2024) ("the fact that the parties so vigorously dispute the correct interpretation of the [City Code at issue] convinces the court that abstention is appropriate to avoid 'disrupti[on] of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'").

And indeed, central questions in this matter are vigorously contested matters of first impression.

For example: Can a sports betting operator escape liability under Baltimore's Consumer Protection Ordinance simply by pointing to its Maryland gaming license? Whether purported regulatory compliance with a gambling regulation provides a defense, a safe harbor, a rebuttable presumption of lawfulness, or no protection whatsoever against a CPO claim implicates a fundamental operation of state law—

an operation about which the parties likely squarely disagree, but on which Maryland courts should be entrusted to provide the first word.

Another issue: Does algorithmic targeting of disordered gamblers constitute an "unfair" trade practice under a statute whose drafters never contemplated behavioral data analytics? Whether deploying behavioral data to identify and overcome vulnerable users' resistance to continued gambling is "unfair" is a specific contested question that requires Maryland courts to define the boundaries of permissible commercial exploitation in a technological context that no Maryland court has confronted.

Yet another hotly contested question of local law: are "risk-free" bets marketed to known problem gamblers "deceptive" when Maryland has authorized the promotional format? Again, resolving a dispute over the fairness of those promotions requires more than applying settled MCPA principles to new facts. It requires determining whether, and to what extent, Maryland's decision to legalize and regulate a particular promotional practice affects the "deceptive" character of that practice under the CPO. That determination will likely have profound consequences not just for Appellants, but for every sports betting operator in Maryland—making it, by definition, a question whose "importance transcends the result in the case then at bar." *NOPSI*, 491 U.S. at 361.

No Maryland court has answered any of these questions[9]—which is precisely why a Maryland court—and not a federal court— should answer them first.

Appellants' insistence otherwise ignores that the novelty of the legal context transforms what might otherwise be familiar statutory language into a vehicle for first-impression policymaking. It is that policymaking function—not the facial familiarity of the statutory text—that triggers *Burford's* concern with state law questions "bearing on policy problems of substantial public import." *NOPSI*, 491 U.S. at 361.

That potential for policy-making through the interpretation of a consumer protection statute is also precisely what this Court confronted in *Johnson*. There, the plaintiffs challenged video poker operators' payout practices—a consumer protection claim that might have appeared straightforward on its face. But this Court recognized that interpreting what constitutes "unfair" conduct in the gambling context would "chart the course of state public policy" and that "the district court erred then in manning the rudder of this aspect of state gaming policy" by deciding the issue. *Johnson*, 199 F.3d at 720–21. The same is true here. The district court properly understood that answering these contested questions would require

[9] While Appellees have cited a number of cases in which Maryland courts have adjudicated typical consumer protection disputes involving, e.g., hidden fees and bait-and-switch tactics (App. Br. at 30 n.7), not one of those cases presented matters of first impression bearing on local state policymaking, much less a city attempting to enforce its consumer protection ordinance against companies engaged in activities subject to state regulation.

"defining, in the first instance, the meaning of terms like 'unfair' and 'deceptive' in the context of the growing market of online gambling," thereby "removing those decisions from the purview of the state courts before they have had any opportunity to weigh in on the CPO." JA158.

### *2. Appellants' Consumer Protection Cases Are Inapposite*

Appellants cite several cases that have refused *Burford* abstention in consumer protection cases, but each is distinguishable. (App. Br. at 31-32).

In *Country Vintner of North Carolina, LLC v. E&J Gallo Winery, Inc.*, 461 F. App'x 302 (4th Cir. 2012), this Court addressed North Carolina's Wine Distribution Agreements Act, which the Court characterized as "a straightforward regulatory scheme that had not been the subject of much controversy in prior state or federal cases." *Country Vintner,* 461 F. App'x at 305. The district court specifically determined the Wine Act "unambiguous" and noted that "interpreting the provisions of the Wine Act would not unduly intrude upon . . . 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id*. (quoting *Martin*, 499 F.3d at 364). None of the factors present in *Country Vintner* are present here, where Maryland's sports betting framework is new, rapidly evolving, subject to ongoing regulatory refinement, and would disrupt state efforts to establish a coherent policy. The issues in that matter also were not like the issues here, which go to the very heart of sports gambling itself—the targeting of the gamblers. The

novel questions presented will recur in countless future cases involving the multi-billion-dollar sports betting industry.

Similarly, *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575 (D. Md. 2014), involved Maryland's automobile sales disclosure requirements—a long-established regulatory scheme with decades of precedent interpreting how those regulations interact with consumer protection law. "Defendants fail[ed] to identify how federal review would disrupt Maryland's efforts to establish a coherent policy concerning a matter of substantial public concern." *Chambers*, 43 F. Supp. 3d at 609. As the City's remand motion explained, "Maryland courts had decades of precedent interpreting how automobile sales regulations interact with consumer protection laws," and "another federal court had already adjudicated the exact same claim without any apparent disruption." JA139. By contrast, no Maryland court has ever addressed how the state's nascent gaming regulations interact with consumer protection standards in the online sports betting context.

The other out-of-circuit cases Appellants cite—*Casey v. F.D.I.C.*, 583 F.3d 586 (8th Cir. 2009), *Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995), and *Crear v. JP Morgan Chase Bank N.A.*, No. 10-10875, 2011 WL 1129574 (5th Cir. Mar. 28, 2011) (App. Br. at 32)—involved neither gambling regulation nor any claim that federal adjudication would disrupt state efforts to develop coherent policy in an area of core state concern. None involved a newly implemented regulatory

framework. None presented first-impression questions about the interplay between consumer protection law and a complex state regulatory scheme. *See, e.g., Crear*, 2011 WL 1129574, at *3 ("This case involved well-settled principles of . . . state law."); *Time Warner Cable*, 66 F.3d at 881 ("The agency consistently has reconciled this tension by opting for the protection of the rate structure whenever that structure is jeopardized by the application of state consumer protection legislation."). None involved subject matter that, as here, lies at "the heart of the state's police power." *Johnson*, 199 F.3d at 715.

### C. The Existence of a Federal Interest In Diversity Jurisdiction Does Not Preclude Abstention

Appellants argue that federal courts have a "paramount federal interest" in exercising diversity jurisdiction and that the District Court erred in characterizing federal interests as "limited or nonexistent." (App. Br. at 47). But this argument misunderstands the *Burford* analysis and the District Court's decision. This Court has made clear that courts, in considering abstention, must "balance the state and federal interests to determine whether the importance of difficult state law questions or the state interest in uniform regulation *outweighs* the federal interest in adjudicating the case at bar." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (emphasis in original). Here, the *only* federal interest is that of exercising diversity jurisdiction. There is no overriding federal interest in state gambling regulation—a longstanding area of state police power. The District Court, weighing that negligible

federal interest against the first-of-its-kind impact this lawsuit will have on sports gambling in Maryland, did not abuse its discretion when it found abstention appropriate.

Appellants next argue that, because in other states federal courts are adjudicating "similar legal and factual issues" in federal, rather than state court. (App. Br. at 40). But those lawsuits are irrelevant.

First, no party in those cases sought remand on abstention grounds—thus the procedural posture is entirely different. *See, e.g.*, *Macek v. DraftKings, Inc.*, No. 2:25-cv-3632 (Docket Sheet); *Youngs v. DraftKings, Inc.*, No. 2:25-cv-179 (Docket Sheet); *Patel v. FanDuel, Inc.*, No. 1:24-cv-7402 (Docket Sheet). *DeLeon v. DraftKings, Inc.*, No. 25-cv-644 (Docket Sheet). Those case's substantive claims also involve different state consumer protection statutes with different regulatory frameworks, different state gambling regimes, and different policy choices.

Further, *Macek*, *Youngs*, *Patel*, and *DeLeon* involve individual gamblers seeking damages for losses under state consumer protection statutes; the plaintiffs have no authority to seek civil penalties, no power to obtain broad injunctive relief reforming platform-wide practices, and no mandate to protect the public at large. By contrast, this governmental enforcement action requires the court to determine, as a matter of public policy, what conduct is permissible for gambling operators doing business in Baltimore—establishing operative legal standards for all sports betting

operations within the City and effectively setting regulatory policy through judicial decree. This case is not a typical civil complaint—but, rather, an enforcement action by the City seeking penalties and injunctive relief. JA153.

When a federal court interprets "unfair" and "deceptive" conduct in a municipal enforcement action seeking to enjoin practices by two dominant industry actors, and impose civil penalties, it dictates how the industry at large must operate within that jurisdiction. The City's decision to enact the CPO and bring this enforcement action reflects Baltimore's sovereign policy judgment about protecting its residents from predatory gambling practices. These state and local interests in shaping gambling policy and consumer protection standards far outweigh the general federal interest in providing a diversity forum, particularly where—as Appellants themselves note—state courts provide adequate forums for resolving these claims. (App. Br. at 35).

### D. Question Certification Is Not a Substitute for Abstention

Appellants argue that even if this case presents difficult state law questions, the District Court should have retained jurisdiction and certified those questions to the Maryland Supreme Court rather than abstaining. (App. Br. at 35-36). While certification is a valuable tool in appropriate cases, it is not a viable alternative to abstention here.

Certification is designed to resolve discrete, cleanly-framed legal questions—not to outsource the wholesale adjudication of a complex, multi-faceted enforcement action. *Bellotti v. Baird,* 428 U.S. 132, 146–47 (1976) ("[A]bstention [versus certification] is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'"). Maryland's certification statute empowers federal courts to certify "determinative" "question[s] of law" to the Maryland Supreme Court. Md. Code Ann., Courts § 12-603.

Many of the critical questions in this case are not pure questions of law at all, but mixed questions of law, fact, and policy that certification cannot reach. For example, whether Defendants' specific algorithmic targeting practices constitute "unfair" conduct requires applying legal standards to detailed factual allegations about data analytics, platform design, user behavior tracking, VIP program structures, and individualized marketing strategies. JA053-55, JA061-JA064, JA071-JA072. Whether particular promotional offers are "deceptive" depends on their specific terms, the context in which they are presented, and the characteristics of the users to whom they are directed. These are quintessentially mixed inquiries that require a court to immerse itself in the factual record—something that the Maryland Supreme Court cannot do through certification and something only a trial

court can accomplish at first instance. Certification addresses what the law means; it does not address how the law applies to a particular set of facts. This case requires both, and the two inquiries cannot be neatly separated.

The administrative reality of certifying numerous "questions of law" that could, *arguendo*, be certified shows that certification here makes little sense. Certifying piecemeal questions would not simplify the litigation; it would fragment it, generating serial rounds of certification, briefing, and decision that would delay resolution for years while the district court shuttled between its own docket and the Maryland Supreme Court's. *See L. Cohen & Co. v. Dun & Bradstreet, Inc*., 629 F. Supp. 1419, 1421 (D. Conn. 1986) (recognizing that certification can be counterproductive when "litigants are shuttled from one courthouse to another and sometimes back again").

Moreover, certification would not cure the fundamental *Burford* concern. Appellants frame certification as resolving the federalism problem because the Maryland Supreme Court would supply the authoritative interpretation of state law. (App. Br. at 35-36). But that framing overlooks what happens after certification. The federal court would still retain jurisdiction. It would still apply the certified answers to the facts of this case. It would still determine whether Defendants' specific practices violate the CPO. It would still decide what injunctive relief to impose and what civil penalties to award. In short, the federal court would still be "manning the

rudder" of Maryland gambling policy, *Johnson*, 199 F.3d at 721—it would simply be doing so with guidance from the state supreme court on selected legal questions rather than charting the entire course unassisted. That is an improvement, but it is not a substitute for allowing state courts to develop this area of law comprehensively, from fact-finding through final judgment, with the full benefit of their institutional familiarity with Maryland's regulatory landscape.

The cases Appellants cite in support of the proposition that certification displaces *Burford* abstention are simply inapposite, due to the relative simplicity of questions involved. (App. Br. at 36). In *Arizonans for Official English v. Arizona*, the Supreme Court certified a single question about Arizona's English-Only Statute. 520 U.S. 43, 79 (1997). In *Rhode Island Truck Center, LLC v. Daimler Trucks North America, LLC*, the First Circuit certified a discrete question of statutory interpretation—whether a state franchise law applied to a particular type of dealership agreement. 92 F.4th 330, 348 (1st Cir. 2024). In *Southern California Edison v. Lynch*, the Ninth Circuit certified narrow questions regarding the meaning of specific statutory provisions governing utility rates and state open-meeting rules. 307 F.3d 794, 806 (9th Cir. 2002). None of these cases involved a comprehensive enforcement action presenting multiple interrelated questions of first impression at the intersection of two distinct regulatory regimes. The certification-over-abstention

cases Appellants rely on involved precisely the type of discrete legal questions that certification is designed to address. (App. Br. at 35-36).[10] This case does not.

This Court has itself recognized that the availability of certification is only a factor in the abstention analysis, not a categorical bar. *See MLC Auto*., 532 F.3d at 284 (treating unavailability of certification as a factor favoring abstention, not availability as a factor precluding it). The District Court here did not abuse its discretion in concluding that, given the number, complexity, and interrelatedness of the novel state law questions presented—and the mixed questions of law and fact that certification cannot reach—complete abstention better serves the interests of comity and federalism than piecemeal certification.

### E. Federal Courts May Abstain When Matters Seek Injunctive Relief And Civil Penalties

In addition to meeting *Burford*'s substantive requirements for abstention, the City's request for civil penalties and injunctive relief supports abstention under *Quackenbush*, where the Supreme Court held that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being

---

[10] *See, e.g., Pittman v. Cole*, 267 F.3d 1269, 1285 (11th Cir. 2001) (certified whether Alabama Canons of Judicial Ethics prohibited judicial candidate from answering questions contained in political questionnaire); *Martinez v. Amazon.com Servs. LLC*, No. CV 22-00502-BAH, 2024 WL 4817214, at *14–15 (D. Md. Nov. 18, 2024) (certified whether a de minimis exception exists for claims under the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law); *Anne Arundel County v. Express Scripts, Inc*., No. CV MJM-24-90, 2025 WL 254807, at *10 (D. Md. Jan. 21, 2025) (certified whether licensed dispensing of FDA-approved medication can constitute public nuisance and what elements/relief apply to such claims by local governments).

sought is equitable or otherwise discretionary,“ but that abstention is “unwarranted“ in “a damages action.“ 517 U.S. at 731.

The relief here is “equitable or otherwise discretionary” and is not for “damages.” *Id*. In addition to the powerful injunctive relief sought—relief that would fundamentally change how Defendants are able to operate—the penalties sought are discretionary and not “damages.” “[A] penalty is ‘[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine.’” *Gonzalez v. Sessions,* 894 F.3d 131, 137 (4th Cir. 2018) (quoting *Penalty*, *Black's Law Dictionary* (10th ed. 2014)). Civil penalties vindicate public policy, deter future violations, and fund enforcement efforts. *See, e.g., Alig v. Quicken Loans Inc*., No. 5:12-CV-114, 2017 WL 5054287, at *28 (N.D. W. Va. July 11, 2017) (collecting cases and analyzing West Virginia's Consumer Protection Act, recognizing that “an award of civil penalties is not conditioned on an award of actual damages”). They represent the government's sovereign interest in protecting its citizens, not a party's interest in recovering losses. Civil penalties under the CPO fit squarely within this category. The ordinance provides that violators are subject to “a civil penalty of not more than $1,000” per violation, Balt. City Code Art. 2, § 4-3(a), (b), leaving the court to determine what amount to impose.

Appellants argue that, because the City seeks civil penalties, *Burford* abstention is not available, because, they say, penalties were traditionally remedies

at law, and not in equity. (App. Br. 42). Appellants' argument primarily rests on their reading of language pulled from *Tull v. United States*, 481 U.S. 412 (1987), where the Supreme Court considered whether the Seventh Amendment guaranteed a jury trial where the U.S. Government was seeking civil penalties and injunctive relief under the Clean Water Act. The Supreme Court ruled that liability for civil penalties was "legal in character" and therefore the defendant there had a right to trial by jury to determine liability on the claim. *Id*. at 425.

But *Tull* is of little help here. The finding in *Tull* that liability for penalties has historically been determined in courts of law, as opposed to determined by courts of equity is unremarkable. The Court in *Quackenbush* purposefully did *not* limit *Burford* abstention to equitable actions—it limited it to actions that were equitable or "otherwise discretionary," contrasting that category of cases with cases for "damages." *Quackenbush*, 517 U.S. at 731. The amount of CPO penalties imposed is, of course, totally discretionary, vesting the court with complete discretion to determine the appropriate amount to deter future misconduct and protect Baltimore citizens. Balt. City Code Art. 2, § 4-3(a).

In other words, penalties under consumer protection statutes are not traditional damages, or even penalties of the kind sought in *Tull*. As one state supreme court explained in analyzing a consumer protection statute, "the gist of a civil action under the [consumer protection statute] is equitable rather than legal in nature" and remains

such "when brought by a private party seeking only an injunction, restitution, or other equitable relief or when brought by the Attorney General, a district attorney, or other governmental official seeking not only injunctive relief and restitution but also civil penalties." *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 462 P.3d 461, 472 (Cal. 2020). In part, this is because consumer protection statutes were "enacted for the specific purpose of creating new rights and remedies that were not available at common law," because of their broad application to "novel but offensive business practices that were not encompassed by more specific statutory prohibitions," because the amount of "civil penalty to be determined" is ultimately determined by the court, and because "none of the early English statutes authorized a prosecuting official to seek and obtain, in the same action, a civil penalty and an injunction that would explicitly restrain the business from committing the prohibited conduct in the future." *Id. See also*, *e.g.*, *People v. Shifrin*, 2014 COA 14, 19, 342 P.3d 506, 512 (Colo. Ct. App. 2014) (collecting cases, finding Colorado's consumer protection law primarily equitable in nature, and explaining that "[t]he majority of courts in other jurisdictions have concluded that similar consumer protection actions are primarily equitable."); *State v. State Credit Ass'n, Inc.,* 657 P.2d 327, 330 (Wash. Ct. App. 1983) ("The relief available in a consumer protection action brought by the State [including restitution, injunction and civil penalties] is entirely equitable."); *State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*, 529

P.3d 599, 609 (Colo. 2023) (action under Colorado consumer protection act primarily equitable, even where civil penalties sought).

The cases are well-reasoned. Cases brought under UDAP statutes "often concern a nuanced and qualitative determination regarding whether a business practice should properly be considered unfair or deceptive[.]" *Nationwide Biweekly*, 462 P.3d at 472. This considerable discretion further distinguishes UDAP statutes from the Clean Water Act at issue in *Tull*, 481 U.S. at 425, or the anti-fraud provisions of the other case Appellants cite (but do not discuss), *SEC v. Jarkesy*, 603 U.S. 109, 120-121 (2024). *See Biweekly,* 462 P.3d at 493 (distinguishing *Tull*); *State ex rel. Weiser,* 529 P.3d at 609 (distinguishing UDAP claim from legal claims like common law fraud, which have a close relationship). And indeed, that discretion is ultimately determinative here, because the Court need not determine whether actions under the CPO should be considered "legal" or "equitable" in nature. It is enough that the penalties are fundamentally "discretionary"—a fact not in dispute here—for *Burford* abstention to be available under *Quackenbush*.

Finally, this Court's decision in *First Penn-Pacific* confirms that the inclusion of civil penalties does not foreclose *Burford* abstention. There, the Maryland Securities Commissioner sought "an injunction, the appointment of a receiver, restitution, and civil penalties." 304 F.3d at 347. This Court affirmed *Burford* abstention without any suggestion that the civil penalty component was

disqualifying—indeed, without even flagging it as a concern. *Id*. at 351. If *Burford* abstention was appropriate in *First Penn-Pacific*, notwithstanding the Commissioner's request for civil penalties, it is equally appropriate here, where the penalties are only part of the City's request for reform of Defendants' predatory practices.

### F. A State Court Should Be The First To Consider The CPO

Finally, Appellants state that the novelty of Baltimore's CPO is "irrelevant," because of the CPO's incorporation into some of its provisions the definitions in Maryland's MCPA. (Br. at 48). To be sure, the Baltimore CPO incorporates the MCPA in some respects, including the MCPA's definitions for unfair, abusive, or deceptive trade practices. But there are many other novel issues of purely local law that will likely be decided here, including the CPO's interaction with state and local laws, and the method of calculating fines. None of these issues have ever been ruled on by any court, and a federal court should not be the first. *Naylor v. Case & McGrath, Inc*., 585 F.2d 557, 564 (2d Cir. 1978) (holding that federal court should abstain from ruling on novel issues raised by newly enacted Connecticut Unfair Trade Practices Act).

## CONCLUSION

For the above-stated reasons, the Court should affirm the District Court's decision.

Date: February 23, 2026

Respectfully submitted,

Ebony M. Thompson
City Solicitor

*/s/* Sara Gross
Sara Gross
Chief, Affirmative Litigation Division
Thomas P.G. Webb
Deputy Chief, Affirmative Litigation Division
**BALTIMORE CITY LAW DEPARTMENT**
City Hall, Room 101
100 North Holliday Street
Baltimore, Maryland 21202
Tel: (443) 984-3421
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov
thomas.webb@baltimorecity.gov

Adam J. Levitt
Daniel R. Ferri
Daniel R. Schwartz
Eaghan Davis
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
dschwartz@dicellolevitt.com
edavis@dicellolevitt.com*

***Counsel for Plaintiff, the City of Baltimore***

*Appearance Filed and Pending

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I filed this document, which caused the Court's electronic filing system to notify all counsel of record, listed below:

Richard R. Patch
Clifford E. Yin
Christopher J. Wiener
Sarah E. Peterson
**COBLENTZ PATCH DUFFY & BASS LLP**
One Montgomery Street, Suite 3000
San Francisco, California 94104
Tel: (415) 391-4800
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-cjw@cpdb.com
ef-sep@cpdb.com

Ty Kelly Cronin (Bar No. 27166)
Alison C. Schurick (Bar No. 19770)
Michael A. Brown (Bar No. 20814)
100 Light Street, 19th Floor
**BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC**
Baltimore, Maryland 21202
Tel: (410) 862-1134
tykelly@bakerdonelson.com
aschurick@bakerdonelson.com
mbrown@bakerdonelson.com

***Attorneys for DraftKings Inc.***

Michael X. Imbroscio (Bar No. 20510)
Phyllis A. Jones
Gary M. Rubman
Andrew P. Stanner

Amber M. Charles
**COVINGTON AND BURLING, LLP**
One CityCenter
850 10th Street NW
Washington, D.C., 20001
(202) 662-6000
mimbroscio@cov.com
pajones@cov.com
grubman@cov.com
astanner@cov.com
acharles@cov.com

***Attorneys for Flutter Entertainment plc***

*/s/* Sara Gross
Sara Gross, Chief Solicitor