**No. 25-2372**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

---

City of Baltimore ex rel. Ebony Thompson,
*Plaintiff-Appellee*,

v.

DraftKings Inc.; Flutter Entertainment PLC,
d/b/a FanDuel, Inc., an Irish Corporation,
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Maryland, Case No. 1:25-cv-01487-SAG,
Hon. Stephanie A. Gallagher

---

# REPLY BRIEF OF DEFENDANTS-APPELLANTS

---

Richard R. Patch
Christopher J. Wiener
Sarah E. Peterson
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street,
Suite 3000
San Francisco, CA 94104
(415) 391-4800
ef-rrp@cpdb.com

*Attorneys for Defendant-Appellant DraftKings Inc.*

Sarah E. Harrington
Jeffrey E. Sandberg
Gary Rubman
Nicole Agama
Ryan S. Sandler
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
sharrington@cov.com

*Attorneys for Defendant-Appellant Flutter Entertainment PLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION AND SUMMARY ........ 1

ARGUMENT ........ 4

I. *Burford* Abstention Is Categorically Inapplicable Because the City's Claims Implicate No State Administrative Processes. ........ 4

II. This Case Does Not Satisfy the Other Preconditions for *Burford* Abstention ........ 7

A. This case presents no "difficult," "transcend[ent]" questions of state law. ........ 8

B. There is no risk that the federal district court will "disrupt[] … state efforts to establish a coherent policy" in this case. ........ 16

C. The City does not seek purely equitable or discretionary relief. ........ 22

III. This Court's Decision in *Johnson v. Collins Entertainment Co.* Does Not Support Abstention Here. ........ 24

A. The City is wrong that *Johnson* expanded the scope of *Burford* abstention to encompass a case like this. ........ 24

B. Maryland's "strong state interest" in regulating gambling—or any other industry—cannot provide an independent basis for abstention. ........ 29

CONCLUSION ........ 33

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Vending, Inc. v. Bowie*,
631 A.2d 77 (Md. 1993) .......... 14

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) .......... 4, 9, 17, 29

*Consumer Prot. Div. Off. of Att'y Gen. v. Consumer Publ'g Co.*,
501 A.2d 48 (Md. 1985) .......... 9

*Consumer Prot. Div. v. George*,
860 A.2d 896 (Md. 2004) .......... 20

*Consumer Prot. Div. v. Luskin's, Inc.*,
706 A.2d 102 (Md. Ct. Spec. App. 1998) .......... 20

*Consumer Prot. Div. v. Luskin's, Inc.*,
726 A.2d 702 (Md. 1999) .......... 20

*Coster v. Dep't of Personnel*,
373 A.2d 1287 (1977) .......... 20

*Deal v. Tugalo Gas Co.*,
991 F.3d 1313 (11th Cir. 2021) .......... 6

*Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*,
710 F.2d 170 (4th Cir. 1983) .......... 17

*El Bey v. Moorish Sci. Temple of Am., Inc.*,
765 A.2d 132 (Md. 2001) .......... 20

*First Penn-Pac. Life Ins. Co. v. Evans*,
304 F.3d 345 (4th Cir. 2002) .......... 33

*Grace Ranch, L.L.C. v. BP Am. Prod. Co.*,
989 F.3d 301 (5th Cir. 2021) .......... *passim*

*Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*,
399 F.3d 1276 (11th Cir. 2005) .......... 10

*Home Depot U.S.A., Inc. v. Jackson*,
587 U.S. 435 (2019) .......... 24

*Johnson v. Collins Ent. Co.*,
199 F.3d 710 (4th Cir. 1999) .......... *passim*

*Johnson v. Collins Ent. Co.*,
204 F.3d 573 (4th Cir. 2000) .......... 25, 26, 28

*Jones v. Buchanan*,
325 F.3d 520 (4th Cir. 2003) .......... 28

*LabMD, Inc. v. FTC*,
894 F.3d 1221 (11th Cir. 2018) .......... 21

*Lord & Taylor, LLC v. White Flint, L.P.*,
780 F.3d 211 (4th Cir. 2015) .......... 20

*Martin v. Stewart*,
499 F.3d 360 (4th Cir. 2007) .......... *passim*

*Meredith v. City of Winter Haven*,
320 U.S. 228 (1943) .......... 4, 11

*Mitcheson v. Harris*,
955 F.2d 235 (4th Cir. 1992) .......... 31

*New Orleans Pub. Serv., Inc.* (*NOPSI*) *v. Council of City of New Orleans*,
491 U.S. 350 (1989) .......... *passim*

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706 (1996) .......... *passim*

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
92 F.4th 330 (1st Cir. 2024) .......... 10

*SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 22

*Shook v. NCG Acquisition, LLC*,
114 F.4th 242 (4th Cir. 2024) .......... 11

*Town of Nags Head v. Toloczko*,
728 F.3d 391 (4th Cir. 2013) .......... 21

*Tsouras v. Manchin*,
431 F. App'x 251 (4th Cir. 2011) .......... 7, 29

*Tull v. United States*,
481 U.S. 412 (1987) .......... 22

**Statutes**

28 U.S.C. § 1332 .......... 31

Balt. City Code art. 2
§ 4-1 .......... 8, 14, 15
§ 4-2 .......... 14
§ 4-3 .......... 23
§ 4-5 .......... 19

Md. Code Ann., Com. Law
§ 13-303 .......... 9, 15
§ 13-406 .......... 19

## INTRODUCTION AND SUMMARY

The district court unjustifiably refused to adjudicate a case that was properly before it to decide. "The Supreme Court has repeatedly instructed that 'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" *Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). The doctrine of *Burford* abstention—an "extraordinary and narrow exception" that, in rare circumstances, protects "complex state administrative processes" from collateral federal interference, *Quackenbush*, 517 U.S. at 727-28 (citation omitted)—provides no grounds for escaping that duty here.

The City's brief on appeal fails to meaningfully grapple with *Burford*'s stringent requirements, which this case flunks many times over. The City's claims arise under statutory authorities enforced through judicial proceedings, not through "complex state administrative processes." *Martin*, 499 F.3d at 360 (citation omitted). Because this case does not and cannot interfere with any state administrative process, that is the end of the inquiry. The district court had no discretion to abstain.

Even past that threshold defect, this case cannot satisfy *Burford*'s other requirements. This case presents no "difficult," "transcen[dent]" state-law issue, but rather the application of longstanding state-law standards. *New Orleans Pub. Serv., Inc.* (*NOPSI*) *v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (citation omitted). The City's claims threaten no greater disruption to the "coheren[ce]" of state consumer-protection regulation if they are adjudicated in federal court than in state court. *Id.* (citation omitted). And this case involves demands for civil money penalties, not purely "equitable or otherwise discretionary" relief. *Quackenbush*, 517 U.S. at 731.

In its brief, the City makes little effort to reconcile its demand for abstention with controlling Supreme Court and circuit precedents. It instead repeatedly asserts that gambling is an area of important state regulation that "lies at the heart of the state's police power." Resp. Br. 1 (citation omitted). But as "both the Supreme Court and this [C]ourt" have made clear, "a strong state interest alone" cannot "justify *Burford* abstention." *Martin*, 499 F.3d at 369.

To the extent the City cites any legal authority, it relies principally on dicta contained in the panel majority opinion in *Johnson v. Collins*

*Entertainment Co.*, 199 F.3d 710 (4th Cir. 1999). But as this Court has made clear, both in subsequent decisions and in *Johnson* itself, that decision did not establish the broad rule the City seeks to derive from it. The district court's invocation of *Johnson* as supporting abstention based on the "confluence of factors" it perceived in this case, JA159, flies in the face of this Court's instruction that abstention can "*never*" rest on such a "free-form *ad hoc* judicial balancing of the totality of state and federal interests in a case." *Martin*, 499 F.3d at 364.

The City's other arguments likewise do not advance their position. As already explained in Defendants' opening brief and further addressed below, the "potential interplay" of the City's consumer-protection claims with state gambling regulations cannot support abstention because the City's own theory is that Defendants are liable "irrespective" of whether they are complying with state gaming regulations. Resp. Br. 12-13, 16, 19, 21, 28. And the City's belated suggestion that it is pursuing this litigation not to recover civil monetary penalties, but instead to obtain "powerful injunctive relief" to "fundamentally change" the way providers of online gaming operate (Resp. Br. 43), cannot justify abstention because such sweeping relief would not be available in state court either.

As this Court has made clear, "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Martin*, 499 F.3d at 363 (citation omitted). Because the district court's decision to abstain under *Burford* was "guided by erroneous legal principles," *id.* (citation omitted), its remand order should be reversed.

## ARGUMENT

### I. *Burford* Abstention Is Categorically Inapplicable Because the City's Claims Implicate No State Administrative Processes.

**A.** The *sine qua non* of *Burford* abstention—and what distinguishes it from other abstention doctrines—is its concern for the integrity of state administrative processes. The most fundamental precondition for abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), is that adjudication in federal court of the claims at issue would "interfere with the proceedings or orders of state administrative agencies." *NOPSI*, 491 U.S. at 361; *see Martin*, 499 F.3d at 364 (describing *Burford*'s domain as preventing "frustrat[ion]" of "a State's complex administrative system"); *see also Meredith v. City of Winter Haven*, 320 U.S. 228, 235 (1943) (explaining that *Burford* protects the "domestic policy of the state

governing its administrative agencies"). Where no such state administrative process exists, *Burford* abstention is unavailable as a matter of law.

As Defendants' opening brief explained, this case fails this most basic prerequisite. The City's claims do not challenge, seek to enforce, or otherwise concern any alleged violation of state administrative regulations. Rather, they invoke an ordinance incorporating the legal requirements of the Maryland Consumer Protection Act (MCPA), a state consumer-protection statute that is routinely enforced through litigation in federal court. *See* Opening Br. 30-31 & n.7 (collecting cases). A federal court's resolution of those claims would not circumvent or frustrate any state administrative mechanism. As the Fifth Circuit put it, "the ability to bring a lawsuit in the [City's] name is not a complex administrative process" upon which *Burford* abstention can be premised. *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 317 (5th Cir. 2021); *see id.* (holding that *Burford* abstention did not apply to claims under "statutes [that] authorize litigation, not administration").

**B.** The City's brief fails to demonstrate any way in which this lawsuit would circumvent or interfere with a state administrative

scheme. In fact, the City implicitly concedes that it would not. The City characterizes this litigation as implicating a "[c]omplex [s]tatutory [f]ramework." Resp. Br. 17. But *Burford* is not a doctrine that allows abstention any time some state statute is involved—if it were, there would be little left of diversity jurisdiction. Rather, "courts may abstain" only "when the availability of an alternative, federal forum threaten[s] to frustrate the purpose of a state's complex administrative system." *Martin*, 499 F.3d at 364.

The City's response mischaracterizes Defendants' argument. Defendants do not argue, as the City suggests, that *Burford* abstention is permitted only when "parallel administrative proceedings" are currently ongoing. *Cf.* Resp. Br. 24. To be sure, comity concerns may be more pronounced in cases where parallel proceedings exist, insofar as simultaneous federal adjudication potentially could threaten to yield inconsistent or contradictory results. *See Johnson*, 199 F.3d at 724 (emphasizing pendency of parallel litigation in state court as factor favoring abstention); *accord, e.g.*, *Deal v. Tugalo Gas Co.*, 991 F.3d 1313, 1326-27 (11th Cir. 2021) (rejecting *Burford* abstention where "there was

(and is) no ongoing state administrative proceeding" or "state court" action).

But the question is not whether parallel administrative proceedings currently "happen to exist." Resp. Br. 27. Rather, the key point here is that the City's claims under the Ordinance cannot be the subject of state administrative proceedings at all. This dispute is inherently one to be resolved through litigation before a generalist court, not in specialized state administrative proceedings followed by state court review. *Cf., e.g.*, *Tsouras v. Manchin*, 431 F. App'x 251, 252 (4th Cir. 2011) (endorsing *Burford* abstention where plaintiff filed collateral action in federal court rather than "appealing the Commission's [licensing] decision through the state court system"). Absent some risk of circumvention or frustration of "complex state administrative processes," *NOPSI*, 491 U.S. at 362, no *Burford* concern arises in the first place. Here, where no such administrative enforcement of the Ordinance is even possible, *Burford* abstention is not available.

## II. This Case Does Not Satisfy the Other Preconditions for *Burford* Abstention.

As Defendants' opening brief explained, this case also fails the other basic prerequisites for *Burford* abstention. Even when (unlike here) a

plaintiff's claims threaten to interfere with state administrative processes, *Burford* abstention remains unavailable unless either difficult state-law questions of transcendent importance are present or federal resolution would disrupt state efforts to establish coherent policy. *NOPSI*, 491 U.S. at 361; *see Martin*, 499 F.3d at 364 (emphasizing that courts must "refuse[] to abstain under *Burford* when neither of [*NOPSI*'s] criteria [is] met"). Moreover, *Burford* abstention is available only where a plaintiff's claims are limited to equitable or discretionary relief and do not demand fixed monetary penalties. That is decidedly not the case here.

### A. This case presents no "difficult," "transcend[ent]" questions of state law.

**1.** For several reasons, this case presents no "difficult questions" of state law whose significance "transcends" the particular business practices at issue. *NOPSI*, 491 U.S. at 361 (citation omitted).

*First*, as the City acknowledges (Resp. Br. 5), the Ordinance does not establish any novel substantive requirements. It instead simply enforces the MCPA's longstanding prohibitions against "unfair, abusive, or deceptive trade practices." Balt. City Code art. 2, § 4-1(13); *accord*

MCPA § 13-303.[1] The MCPA has existed substantially in its present form for decades, *see Consumer Prot. Div. Off. of Att'y Gen. v. Consumer Publ'g Co.*, 501 A.2d 48 (Md. 1985) (discussing history of MCPA's enactment), and federal and state courts alike routinely interpret it, *see* Opening Br. 30-31 (collecting citations).

*Second*, the City's state-law claims do not "transcend[] … the case … at bar" in the manner contemplated by precedent. *NOPSI*, 491 U.S. at 361. The parties' dispute is limited to the lawfulness of particular marketing practices of two online sports-betting businesses. Adjudication of those claims will not determine the rights of other parties not before the Court; rather, the City's suit "stands or falls on its own." *Grace Ranch*, 989 F.3d at 317; *cf. Burford*, 319 U.S. at 319 (concluding that abstention was warranted because adjudication of the oil rights in the case would necessarily determine the rights of third parties to the same oil field). Even if a federal court's adjudication of the City's claims could result in a precedential interpretation of state law, that is not the sort of transcendence contemplated by the *Burford* doctrine. If it were,

[1] The MCPA is codified at Title 13 of Maryland's Commercial Law Article. *See* Md. Code Ann., Com. Law § 13-101 et seq.

abstention would be appropriate in any diversity case involving interpretation of state law. Abstention on this basis is limited to situations in which adjudication of parties' claims will directly determine the rights of non-parties, as in *Burford* itself. No such concern is present here.

*Third*, in the unlikely event that a difficult, case-dispositive state-law issue were ultimately to arise in this litigation, the best mechanism to address that is not abstention. Rather, federal appellate and district courts alike can certify questions directly to the Maryland Supreme Court. *See* Opening Br. 35-37. This certification process "accommodates the federalism interests" that might favor having a particular question of state law decided by a state court in the first instance. *Grace Ranch*, 989 F.3d at 315, 319; *see also R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 92 F.4th 330, 348 (1st Cir. 2024) (rejecting *Burford* abstention and certifying state-law question to state appellate court as a "cheaper, faster, and simpler alternative"); *Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278-79 (11th Cir. 2005) (citing strong state interest in "regulation of gambling" as grounds for certifying question of state gaming law to Florida Supreme Court).

**2.** The City does not argue that this case presents state-law questions of unusual difficulty or transcendent importance. Rather, it protests that no state court has yet confronted the question whether the particular business practices at issue here run afoul of the MCPA's prohibitions against unfair or deceptive trade practices. *Cf.*, *e.g.*, Resp. Br. 1 (asserting that this case presents a "first-in-time enforcement of [the City's] consumer protection ordinance regarding a defendant's gambling program" and its "application … to the purposeful targeting of Maryland gamblers").

That purported novelty in no way warrants abstention. Nearly every case is one of first impression in the sense that it involves "application" of established legal principles to a distinct set of facts. *Cf. id.* But interpreting and applying state law to novel facts is not a basis for abstention; rather, it is the "duty of the federal courts" in diversity cases. *Meredith*, 320 U.S. at 234; *see Shook v. NCG Acquisition, LLC*, 114 F.4th 242, 250 (4th Cir. 2024) ("[A]pplying [state law] is squarely within our purview."). The "difficult," "transcende[nt]" questions of state law that the Supreme Court has contemplated as potentially warranting abstention cannot be the ordinary tasks of adjudication that inhere in

every diversity case. *NOPSI*, 491 U.S. at 363 (citation omitted). Accepting the City's view—that merely applying settled legal principles to a new defendant or circumstance justifies abstention—would vitiate diversity jurisdiction, with *Burford* abstention becoming the "rule" rather than an "extraordinary and narrow exception." *Martin*, 499 F.3d at 363 (quoting *Quackenbush*, 517 U.S. at 716; *NOPSI*, 491 U.S. at 359).

**3.** The City asserts that this case may involve the "potential interplay" of the MCPA with state gambling regulations. Resp. Br. 6. But that assertion fails to justify abstention for multiple reasons.

As Defendants previously explained (Opening Br. 28) and the City again concedes, the City's central theory in this lawsuit is that Defendants are liable "irrespective" of whether they are complying with state gaming regulations. Resp. Br. 21. In other words, the City maintains that consumer-protection "liability can attach *despite* [Defendants'] regulatory compliance" with state gambling regulations. *Id.* at 29 (emphasis added). The City cannot seek abstention on the basis that its case requires interpretation of state gambling regulations when the City's own position is that compliance with those same regulations is

irrelevant to liability under the consumer-protection Ordinance it seeks to enforce here.

At most, the City hypothesizes that Defendants could raise, as one of various possible defenses, an argument that compliance with state gambling regulations should counsel against liability under the MCPA for unfair or deceptive conduct. But that is not a basis for *Burford* abstention. The City cites no support for its assertion that the prospect that a defendant will raise a particular defense relating to some collateral regulatory scheme warrants *Burford* abstention. *Cf.* Resp. Br. 17, 31. In all events, the question whether compliance with industry-specific state regulations provides a defense to liability under generally applicable consumer-protection laws is itself a question of consumer-protection law—and that question is to be resolved in court, not through any state administrative process.

Even if the City were correct that a possible defense to liability could be relevant in a *Burford* analysis, that would not provide a basis for abstention here because it is quite unlikely that the district court would ever reach that issue. The City overlooks that this case can and will likely be resolved on any of various other grounds, before any

hypothetical need to consider "interplay" with state gaming regulations would arise. As previously noted (*see* Opening Br. 35 n.8), Defendants' businesses do not involve the provision of any "consumer goods," "consumer services," or "consumer realty" within the meaning of the Ordinance. Balt. City Code art. 2, § 4-1(5)-(7); *accord id.* § 4-2. The City's complaint also fails to adequately plead several essential elements of claims for unfair or deceptive trade practices under Maryland law. *Cf. id.* §§ 4-1(13), 4-2. And the Ordinance is not an authorized "local" law within the meaning of the Maryland constitution. *Cf. Allied Vending, Inc. v. Bowie*, 631 A.2d 77, 85 (Md. 1993).[2] None of these issues implicates state gaming regulations, but each is independently dispositive of the City's claims.

The City's repeated emphasis on the "novelty" of its Ordinance, Resp. Br. 33, is another red herring. As the City itself acknowledges, the

---

[2] The City admits that it is pursuing this litigation in hopes that a court will fashion "broad injunctive relief" to "reform[] platform-wide practices" (i.e., practices that extend statewide). Resp. Br. 37; *see id.* at 10 (describing objective of obtaining "injunctive relief that would fundamentally alter how these platforms operate"); *id.* at 40-41 (explaining that City will seek injunction "'manning the rudder' of Maryland gaming policy"). These and similar statements confirm that the CPO, as applied in this case, is not a "local" law.

Ordinance does not prohibit any otherwise lawful conduct but instead "explicitly incorporates" existing state-law prohibitions. Resp. Br. 5; *see* Balt. City Code art. 2, § 4-1(13) (incorporating MCPA § 13-303). In other words, there is nothing novel about the legal principles the City seeks to apply. And contrary to the City's assumption—reflected in its "consisten[t]" demands for *Burford* abstention across its recent consumer-protection cases (Resp. Br. 7 n.5)[3]—the fact that a local government has enacted an ordinance paralleling longstanding state law does not automatically provide the City with a veto over the congressionally conferred right of out-of-state defendants to proceed in a federal forum. And, as noted (*supra* pp. 11-12), any supposed novelty in applying longstanding legal standards to a new set of facts is a feature of diversity jurisdiction, not a bug requiring abstention. Accepting the City's assertions to the contrary would turn a narrow abstention doctrine

[3] On March 4, 2026, the City filed another similar consumer-protection case under the CPO in the Circuit Court of Baltimore City against several online casino sweepstakes operators, which are not subject to the state gaming regulations. *Mayor & City Council of Balt. ex rel. Thompson v. VGW d/b/a Chumba Casino & Luckyland Slots* No. C-24-CV-26-001646 (Md. Cir. Ct. Balt. City). The defendants in that case have not yet responded or removed to federal court. It currently is unknown whether the City intends to invoke *Burford* abstention in the event of a removal.

into an enormous loophole in the duty of federal courts to exercise jurisdiction where conferred.

Finally, the City cannot credibly suggest that state-law certification procedures would be inadequate in the unlikely event that this case required resolution of some difficult, disputed question of Maryland state law. The City urges that federal courts may certify only "determinative questions of law" to the Maryland Supreme Court. Resp. Br. 39 (cleaned up). But that limitation simply reflects the general rule in our constitutional system that federal courts are authorized to decide disputed questions of state law in diversity cases. Indeed, state-court certification procedures arose precisely in order to address federal courts' "being too quick to abstain" under *Burford* "as a means to avoid deciding difficult, unsettled questions of state law." *Grace Ranch*, 989 F.3d at 315.

### B. There is no risk that the federal district court will "disrupt[] … state efforts to establish a coherent policy" in this case.

**1.** As previously explained, this case also does not implicate the second prong of *NOPSI*, which permits *Burford* abstention in the extraordinary circumstance when federal litigation would fundamentally subvert the "coheren[ce]" of an unusually important state regulatory

scheme. 491 U.S. at 361 (citation omitted). The City asserts that federal adjudication of their consumer-protection claims would "disrupt[] state efforts to establish a coherent policy" governing sports betting in Maryland. Resp. Br. 12-13. But the circumstances that have justified abstention under a coherence theory bear no resemblance to the situation here.

In *Burford*, federal adjudication of the rights of the immediate parties before the Court would have affected the amount of oil available in the single "giant pool" available to all drillers, necessarily adjudicating the rights of every participant in the oil industry and preventing Texas from "establish[ing] a coherent policy" on matters of fundamental economic importance. *NOPSI*, 491 U.S. at 361. Federal adjudication would also have circumvented the single state court in which specialized review had been centralized precisely for the purpose of ensuring statewide uniformity. *Id.* at 325-26.

No similar concerns are present here. This case implicates no common resources or interrelated industry-wide problems; nor does it threaten to usurp "integrated" judicial review by "specially authorized state courts." *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710

F.2d 170, 173 (4th Cir. 1983); *see also, e.g.*, *Grace Ranch*, 989 F.3d at 318 (*Burford* abstention disfavored if State "provides no special forum for judicial review"). Indeed, as explained, the City's claims involve no state administrative apparatus at all. *Burford*'s concern with "disrupti[ng] … state efforts to establish a coherent policy" through complex state administrative regulation is therefore not implicated. *NOPSI*, 491 U.S. at 361.

**2.** The City does not dispute that its claims do not challenge, seek to enforce, or otherwise depend upon Maryland's comprehensive scheme for regulating gambling. It instead suggests that this case should proceed in state court because the City intends to seek sweeping injunctive relief that would be inappropriate for a federal court to enter. *See, e.g.*, Resp. Br. 10 (City seeks "injunctive relief that would fundamentally alter how these platforms operate" and "industry operations" more generally); *id.* at 19 (City here "likewise seeks injunctive relief" akin to the parallel code of regulations imposed by the district court in *Johnson*); *id.* at 21 (insisting that "the injunctive relief the City [will be] awarded is 'extensive'" (citation omitted)); *id.* at 37 (impliedly demanding "broad injunctive relief reforming platform-wide

practices"); *id.* at 43 (demanding "powerful injunctive relief … that would fundamentally change" online sports gambling in the State of Maryland).

The City's argument fails at every level. As an initial matter, it is doubtful that the City could ultimately prevail in showing Defendants' challenged practices to be "unfair" or "deceptive," much less to overcome Defendants' various threshold defenses (*see supra* pp. 13-14).

Just as importantly, the City cites no support for its remarkable assumption that the Circuit Court of Baltimore City would be permitted to "man[] the rudder" of statewide gaming policy. Resp. Br. 40-41. State courts adjudicating consumer-protection claims under Maryland law do not develop their own "parallel" codes of regulatory requirements, Resp. Br. 11, 22, but instead provide relief tailored to the precise conduct found to be unlawful. *See* MCPA § 13-406(a) (Attorney General "may seek an injunction to prohibit a person who has engaged or is engaging in a violation of this title from continuing or engaging in the violation"); Balt. City Code art. 2, § 4-5(d) (City Solicitor "may initiate a legal proceeding for injunctive relief"). Under Maryland law, permanent injunctive relief is "reserve[d]" for circumstances where it is "essential" to prevent "irremediable injury" otherwise caused by each specific act to be

restrained, so that an injunction is no broader than necessary to remedy the plaintiff's proven harms. *El Bey v. Moorish Sci. Temple of Am., Inc.*, 765 A.2d 132, 139 (Md. 2001) (quoting *Coster v. Dep't of Personnel*, 373 A.2d 1287, 1289-90 (1977)); *see also Lord & Taylor, LLC v. White Flint, L.P.,* 780 F.3d 211, 217-19 (4th Cir. 2015) (applying Maryland remedial law in diversity case) (rejecting demand for broad affirmative injunction that would entail "[c]ontinuous judicial supervision of commercial relationships"). The City cannot defeat federal jurisdiction by claiming entitlement to relief that would be inappropriate in any court and then insisting that only a local court should grant that relief.

Similar constraints on injunctive relief apply in federal court to claims arising under federal law, to which Maryland courts have "look[ed] … for guidance" when determining the appropriate scope of injunctive relief. *Consumer Prot. Div. v. Luskin's, Inc.*, 706 A.2d 102, 122 (Md. Ct. Spec. App. 1998), *rev'd in part on other grounds*, 726 A.2d 702 (Md. 1999); *see Consumer Prot. Div. v. George*, 860 A.2d 896, 906-07 (Md. 2004) (similar). That federal law would include *Johnson* itself. *See Johnson*, 199 F.3d at 729 (rejecting view under which courts exercise "sweeping equitable authority" to promulgate their own gaming

regulations); *accord, e.g.*, *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1237 (11th Cir. 2018) (vacating "micromanaging" order in federal consumer-protection case that was "beyond the scope of court oversight contemplated by injunction law").

The City also again raises the "potential for dis-uniformity" between "Baltimore and the rest of Maryland," which in its view "sharpens" its demand for abstention. Resp. Br. 22-23. But the potential disuniformity with which *Burford* is concerned is the threat that federal adjudication would present to the uniform administration of an otherwise coherent state administrative scheme. Here, any potential disuniformity has nothing to do with whether this case proceeds in state or federal court; rather, it is a problem deriving from the City's decision to enact its own ordinance. *See* Resp. Br. 22-23 (admitting that "*the City* created the potential for regulatory tension between the local and state standards" (emphasis added)). This Court has previously rejected the suggestion that municipal plaintiffs can premise a demand for *Burford* abstention on their own disuniform conduct, and it should do so again here. *See Town of Nags Head v. Toloczko*, 728 F.3d 391, 398 (4th Cir. 2013) (rejecting abstention where, *inter alia*, "it is the Town, not the federal

courts, that has interfered with North Carolina's governance of public trust lands").[4]

### C. The City does not seek purely equitable or discretionary relief.

Finally, the City's effort to evade federal jurisdiction fails for yet another reason, which is that a federal court "has the authority to decline to exercise its jurisdiction" under *Burford* only "when it 'is asked to employ its historic powers as a court of equity.'" *Quackenbush*, 517 U.S. at 717 (citation omitted). Here, the City does not seek purely "equitable or discretionary relief." *Id.* at 730. Rather, it seeks civil penalties, a remedy that the Supreme Court has expressly held "could only be enforced in courts of law." *Tull v. United States*, 481 U.S. 412, 422 (1987); *see id.* at 424 ("[W]hile a court in equity may award monetary restitution … it may not enforce civil penalties"); *cf. SEC v. Jarkesy*, 603 U.S. 109, 123 (2024) (recognizing that a "monetary remedy is legal … if it is

---

[4] In brushing off its own role in creating the potential for disuniformity, the City purports to rely on a "structural asymmetry" by asserting that a state court's interpretation of a municipal ordinance "exists within a self-correcting ecosystem of state governance." Resp. Br. 23. The City fails to explain what it means by these assertions, and no explanation is apparent.

designed to punish or deter the wrongdoer" as opposed to "restor[ing] the status quo" (citation omitted)).

The City posits that its demand for civil penalties could be deemed "equitable or otherwise discretionary" insofar as the Ordinance authorizes but does not automatically compel penalties of up to $1,000 per violation. Resp. Br. 43-46 (citation omitted); *cf.* Balt. City Code art. 2, § 4-3(a). That argument is difficult to reconcile with the City's previously declared position that the court should impose "the maximum amount of statutory penalties available," JA074, without regard to equitable considerations.

In any event, as the City does not dispute, the monetary relief it seeks is expressly punitive, which also cuts against abstention. While it is always true that "[t]he right … to choose a Federal court where there is a choice cannot be properly denied," *Martin*, 499 F.3d at 370, a defendant's interest in removal to a federal forum is at its height when the plaintiff does not seek merely to restore adherence to regulatory rules but instead to punish the defendant. It is precisely such regard for the rights of defendants that motivated Congress to enact—and maintain—diversity jurisdiction to facilitate a "'neutral forum' for parties from

different States" to resolve their allegations of wrongdoing. *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 438 (2019) (citation omitted).

## III. This Court's Decision in *Johnson v. Collins Entertainment Co.* Does Not Support Abstention Here.

Unable to make this case fit within the confines of *Burford* abstention as established by the Supreme Court and applied by this Court, the City puts all its eggs in the basket of *Johnson v. Collins Entertainment Co.*, 199 F.3d 710 (4th Cir. 1999), as it did in the district court. But the City's overreading of the panel decision in *Johnson* cannot support abstention in this case.

### A. The City is wrong that *Johnson e*xpanded the scope of *Burford* abstention to encompass a case like this.

As Defendants' opening brief explained (Br. 50-55), the City's attempt to seek refuge in *Johnson* must fail because that case does not remotely bear the weight the City seeks to place on it. Indeed, this Court has already rejected the expansive reading that the City would give it.

First, this case is *not* "on all fours" with the facts of *Johnson*. Resp. Br. 18. Beyond the fact that both cases involve gambling, there is little resemblance between the two. The principal question at issue in *Johnson* was the meaning of a state gaming statute—specifically, a $125 daily

payout limit on certain video poker machines—to which the private plaintiffs' consumer-protection claims were ancillary. *Cf.* 199 F.3d at 720-21 (addressing consumer-protection claims in only one paragraph). That same interpretive question was simultaneously the subject of active litigation in state tribunals. *See id.* at 721; *see also id.* at 731 (Luttig, J., concurring only in the judgment) (emphasizing related "proceedings pending in the state supreme court"); *Johnson v. Collins Ent. Co.* (*Johnson II*), 204 F.3d 573, 575 (4th Cir. 2000) (Wilkinson, J., concurring in denial of rehearing en banc) (emphasizing panel's reliance on fact that the same legal questions were pending in state court "at the very time the district court rendered its pronouncements"). Here, the City's theory of liability does not require interpretation of any state gaming statute or regulation at all; it instead claims that Defendants' marketing practices constitute unfair or deceptive conduct under the City's local Ordinance.

Equally importantly, *Johnson*'s ultimate abstention ruling rested in principal, if not overriding, part on the extraordinary remedial order entered in that case. The district court in *Johnson* had arrogated a "substantial" role for "itself" in "establish[ing] parallel" federal "oversight of the [state] video poker industry," without any express basis in state or

federal law to order such injunctive relief. *Johnson*, 199 F.3d at 723-24. This Court emphasized that the "extensive set" of measures that the district court imposed were "exactly the types of requirements ordinarily prescribed by state statutes or state enforcement agencies," including mandatory signage on every video poker machine with verbatim "precise language," "detailed" logging requirements for every "cash payout" transaction, and various other obligations that effectively "supplanted the legislative, administrative, and judicial processes of South Carolina." *Id.* at 719, 724. As then-Chief Judge Wilkinson further clarified when this Court narrowly denied en banc review, the lynchpin of the panel's ruling was its rejection of the district court's "assumption of state regulatory prerogatives." *Johnson II*, 204 F.3d at 575 (Wilkinson, J., concurring in denial of rehearing en banc).[5] Here, of course, there is no

---

[5] In addition, the district court in *Johnson* improperly imposed its regulatory mandates on only eight "target[s]" among the sixty named defendants. 199 F.3d at 718, 725. The district court's "commandeering of state enforcement efforts" thus demonstrated "selective enforcement," "supplanted the efforts of the state agencies charged with the enforcement of the regulatory scheme," and contradicted the stated position of the state attorney general that "regulatory oversight" should lay with "the administrative arm of state government." *Johnson II*, 204 F.3d at 575-76 (Wilkinson, J., concurring in the denial of rehearing en banc).

reason to expect that the district court would act *ultra vires* by arrogating authority beyond that granted by state and federal law.

In reality, the City relies on *Johnson* not for its actual holding but for its broad statements about the benefits of abstention in the functioning of our federal system. Yet *Johnson* itself emphasized that its rhetorical flourishes should not be taken as reflecting any substantive change in Circuit law. Rather, the panel's decision ultimately rested on "a specific and detailed analysis of the[] particular facts and circumstances" of that case. 199 F.3d at 728 n.7. Judge Luttig concurred in the judgment specifically to underscore that the more "expansive statements" in the panel opinion's dicta had not enlarged the permissible scope of *Burford* abstention. *Id.* at 729 (Luttig, J., concurring in judgment); *see id.* (disapproving of statements in the majority opinion that reflected "view[s] of … policy, not law itself"). And all panelists in *Johnson* reaffirmed that "[a]bsention remains the exception and the exercise of congressionally mandated jurisdiction remains the rule." *Id.* at 722-23 (majority op.); *accord id.* at 730 (Luttig, J.) (similar).

This Court's subsequent treatment of *Johnson* confirms the decision's narrow compass. First, in the evenly divided en banc vote in

*Johnson* itself, both sides of the Court cautioned against overreading the panel's decision. *Compare Johnson II*, 204 F.3d at 576-77 (Wilkinson, J., concurring in denial of rehearing en banc) (reaffirming that the outcome ultimately depended "on an examination of the totality of the particular circumstances present in the given case"), *with id.* at 577 (Motz, J., dissenting from denial of rehearing en banc) (disapproving of panel dicta that went beyond "even the most expansive understanding of the *Burford* doctrine").[6]

Subsequently, in *Martin v. Stewart*, this Court again read *Johnson* narrowly. The district court in *Martin*—like the City here—had mistakenly viewed *Johnson* as broadly supporting abstention in cases involving state gambling regulation. But this Court clarified that it had ultimately abstained in *Johnson* not "*because* it involved the regulation of th[e] important state interest" in gambling, emphasizing that "[a]bstention on that basis would be improper." *Martin*, 499 F.3d at 369.

[6] This Court has looked to decisions respecting the denial of rehearing en banc for guidance in understanding the scope of prior panel opinions, although the practice has not been without controversy. *See, e.g.*, *Jones v. Buchanan*, 325 F.3d 520, 538 (4th Cir. 2003) (Luttig, J., dissenting) (addressing practice whereby panels "fine-tune, if not fundamentally reshape, the[ir] legal analysis … in the course of opinions respecting the denial of rehearing en banc" (emphasis omitted)).

Rather, *Johnson* directed abstention because "the criteria for *Burford* abstention were met," including that the "relief sought [in *Johnson*] would 'effectively establish parallel federal and state oversight of the state video poker industry.'" *Id.* (brackets omitted) (quoting *Johnson*, 199 F.3d at 724); *see also id.* at 369 n.7 (specifically emphasizing the extent to which the district court in *Johnson* "effectively commandeered the State's enforcement efforts" by designing its own "extensive set of requirements" (brackets omitted) (quoting *Johnson*, 199 F.3d at 718, 723)); *cf. Tsouras*, 431 F. App'x at 254 (endorsing *Burford* abstention not simply because the case involved gambling, but because the plaintiff's claims sought collateral review of a state agency's licensing decision and thus would "interfere with the proceedings or orders of state administrative agencies").

**B. Maryland's "strong state interest" in regulating gambling—or any other industry—cannot provide an independent basis for abstention.**

Relying in large part on *Johnson*, the City devotes the bulk of its brief to arguing that abstention is warranted because this suit concerns gambling, which it characterizes as an "area of core state police power." *See* Resp. Br. 13-15 (capitalization omitted). But as Defendants' opening

brief explained, "both the Supreme Court and this [C]ourt have specifically rejected the view that a strong state interest alone could justify *Burford* abstention." *Martin*, 499 F.3d at 369. Rather, abstention is permissible only when the case falls into the "defined specific doctrine[]" established by the Supreme Court. *Id.* at 364. As explained above, this case fails in multiple respects to satisfy the doctrinal requirements for abstention.

In fact, although the City takes considerable pains to defend the proposition (never contested by Defendants) that "gambling regulation [i]s a quintessential state function," Resp. Br. 14, the City's theory of *Burford* abstention is in no way conceptually limited to the gambling context. In the City's view, it is enough that a lawsuit "bear on significant state policy problems" of any kind. *E.g.*, Resp. Br. 23. Indeed, the City freely acknowledges that, across a swath of "litigation involving different industries and different regulatory regimes," it has "consisten[tly]" "invoked *Burford* abstention." Resp. Br. 7 n.5; *see* Opening Br. 7-8 (describing various recent cases in which the City has opposed federal adjudication of claims under the Ordinance, including in contexts of nicotine pouches, short-term loans, and single-use plastic products).

Equally striking is the City's disparagement of the strong federal interest in resolving this dispute. The Constitution expressly defines "[t]he judicial Power" to encompass "[c]ontroversies … between citizens of different states," U.S. Const. art. III, § 2, and Congress has exercised its constitutional authority to confer that power on federal district courts, *see id.* § 1; 28 U.S.C. § 1332. "Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *NOPSI*, 491 U.S. at 359. The federal government's interest in the implementation of federal law is not "negligible" (Resp. Br. 36-37) or "limited or nonexistent" (*id.* at 15 (quoting JA160)). On the contrary, proper respect for both the separation of powers and federalism requires federal courts to exercise their congressionally conferred jurisdiction except in the rarest circumstances. *See generally Mitcheson v. Harris*, 955 F.2d 235, 237 (4th Cir. 1992) (recognizing the "paramount federal interests in having federal courts resolve questions of state law and accord protection to out-of-state parties").

The City's protest that there is "no overriding federal interest" in "gambling" specifically, Resp. Br. 36, in no way detracts from the strength of the federal interest in the exercise of federal jurisdiction by federal

courts under duly enacted federal statutes. "If [Congress] wishes that [federal courts] serve as the arbiters of a class of disputes, then [those courts] are affirmatively obliged to do so, regardless of [a judge's] personal assessment of the wisdom of that decision." *Johnson*, 199 F.3d at 729 (Luttig, J., concurring in the judgment).

More generally, as this Court has emphasized, *Burford* abstention is not a "license for free-form *ad hoc* judicial balancing" of a totality of the circumstances to decide which forum seems most expedient or to have the strongest subject-matter interest. *Martin*, 499 F.3d at 364. A court cannot—as the district court did here—simply invoke a case-specific "confluence of factors," untethered to doctrinal requirements, as justification for surrendering its jurisdiction. JA159. *Burford* abstention remains an "extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it," available only when certain stringent requirements are satisfied. *Quackenbush*, 517 U.S. at 728 (citation omitted). This Court should take the opportunity here to reaffirm its adherence to Supreme Court precedent and demonstrate its consistency with the law of other circuits, rather than to "chart[] its own course in the area of federal court abstention" in

the manner the City invites here. *First Penn-Pac. Life Ins. Co. v. Evans*, 304 F.3d 345, 351 (4th Cir. 2002) (Luttig, J., dissenting).

**CONCLUSION**

For the foregoing reasons, the district court's order remanding this case to state court should be reversed.

Respectfully submitted,

/s/ Sarah E. Harrington
Sarah E. Harrington
Jeffrey E. Sandberg
Gary Rubman
Nicole Agama
Ryan S. Sandler
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
sharrington@cov.com

*Attorneys for Defendant-Appellant Flutter Entertainment PLC*

Richard R. Patch
Christopher J. Wiener
Sarah E. Peterson
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street,
Suite 3000
San Francisco, CA 94104
(415) 391-4800
ef-rrp@cpdb.com

*Attorneys for Defendant-Appellant DraftKings Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type-style, and type-volume limitations. This brief was prepared using a proportionally spaced type (Century Schoolbook, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,454 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.